Public Utilities Commission
No. 84-502
No. 84-530

APPEAL OF SEACOAST ANTI–POLLUTION LEAGUE

APPEAL OF CAMPAIGN FOR RATEPAYERS' RIGHTS
(New Hampshire Public Utilities Commission)

November 27, 1984 (Part I)
April 12, 1985 (Part II)

*Backus & Meyer*, of Manchester (*Robert A. Backus* on the brief and orally), for the Seacoast Anti-Pollution League.

*Paul McEachern*, of Portsmouth, and *Robert Hinkley*, of Manchester (*Mr. McEachern* and *Mr. Hinkley* on the brief, and *Mr. McEachern* orally), for the Campaign for Ratepayers' Rights.

*Sulloway, Hollis & Soden*, of Concord (*Martin L. Gross* on the brief and orally), for Public Service Company of New Hampshire.

*Gregory H. Smith*, attorney general, and *Larry M. Smukler*, of Concord (*David S. Peck*, attorney, and *Mr. Smukler* on the brief, and *Mr. Peck* orally), for the State, as amicus curiae.

*Robert L. Baum*, of Washington D.C., by brief for Edison Electric Institute, as amicus curiae.

PER CURIAM.    This is an appeal from an order of the public utilities commission granting the petition of Public Service Company of New Hampshire for authority to issue securities in an amount up to $425 million. We affirm.

PART I (November 27, 1984)

RSA 369:1 and 4 empower a public utility to engage in financing by issuing and selling securities with the approval of the commission. That approval must rest on a finding that the issue would be consistent with "the public good." *Id.* On June 29, 1984, the company filed its petition for approval of this financing.

The financing will implement the second of a three-step financing plan devised in the spring of 1984 in response to the company's financial problems. The commission approved the first step of that plan earlier this year by authorizing the sale of $90 million of short-term securities.

The securities to be issued under this second step will be deben-

tures and warrants. The object of this sale is to provide funds to retire the $90 million indebtedness incurred as step one, plus $335 million in new money.

About ten percent of this money is intended for the company's share of new construction at the Seabrook nuclear power plant. The remainder will be used for debt service on the company's investment in that plant, for projects unrelated to Seabrook and for expenses of financing.

The anticipated third step in the plan has been given the name of Newbrook. The Newbrook financing would provide the company's share of money needed to complete the first reactor at Seabrook. The amount of that share has been estimated at $350 million, though a preliminary prospectus issued on September 4, 1984, is said to have put the amount at $730 million. The commission has already opened a docket, DF 84-200, for consideration of the Newbrook financing, though it has not begun hearings on it.

On July 30, 1984, the commission issued a procedural order that recognized the requirement of *Appeal of Roger Easton*, 125 N.H. 205, 480 A.2d 88 (1984). That case held that RSA 369:1 and 4 obligate the commission to consider the economic justifiability of the object of a financing, in deciding whether the financing would be in the public good.

The company objected to this first procedural order and presented the testimony of two witnesses that there would be a *de facto* denial of the petition unless the commission reached a decision on this second step financing by August 31, 1984. They gave their opinions that even an approval of the request after that date would come too late for the company to raise the money in time to stave off bankruptcy.

In response to this testimony, the commission issued a second procedural order on August 2, 1984. In that order the commission stated its finding that the company's financial situation required action on the petition to approve the second step financing before it would be possible to complete any *Easton* inquiry into the economic justifiability of allowing the company to participate in the completion of the first Seabrook reactor. The commission therefore deferred the *Easton* inquiry to the time of the anticipated hearing on the third or Newbrook step of the financing plan.

The second procedural order accordingly limited the scope of the inquiry into the public good under the present petition to a consideration of

"1) the terms, conditions and amount of the proposed financing;

2) the purpose of the proposed financing; and

3) the *short* term effect of successful completion of the proposed financing on the company's capital structure."

(Emphasis supplied.)

The commission proceeded to take evidence in addition to the testimony from the witnesses mentioned above, and on August 28 it granted the petition to approve the second step of the financing plan. The Seacoast Anti-Pollution League (SAPL) then filed an appeal on two issues and requested an emergency hearing. It appealed the refusal of the commission's chairman to recuse himself and the limitation provided by the second procedural order on the scope of the inquiry into public good.

We ruled on these issues on September 7, 1984, in *Appeal of Seacoast Anti-Pollution League*, 125 N.H. 465, 482 A.2d 509 (1984). We held that the chairman should have recused himself, and for that reason we vacated both the order granting the petition and the second procedural order, in which the chairman had participated.

Since it was clear that the scope of the inquiry would be contested on remand as it had been in the first instance, we went on to consider the merits of the second procedural order, and by a divided court we upheld it on its merits. The majority held that the *Easton* inquiry into the economic desirability of the company's continuing participation in construction of the first Seabrook reactor could be deferred until the commission considered the Newbrook step of financing. The majority accepted the commission's determination that the company's financial position required action on the financing request before it would be possible to complete an *Easton* inquiry. Since only ten percent of the second step financing would go for new Seabrook construction, and since the Newbrook hearing would be devoted to a request for substantial funds to complete the first Seabrook reactor, the majority concluded that postponement of the *Easton* inquiry to the Newbrook step would not render that inquiry academic. Thus the majority concluded that it was not unlawful or clearly unreasonable within the meaning of RSA 541:13 to defer the *Easton* inquiry, and consequently upheld the merits of the second procedural order.

Following our earlier opinion on September 7, 1984, the chairman of the commission recused himself, and the Governor and Council appointed John N. Nassikas, Esq., as a special commissioner. *See* RSA 363:20. The intervenor SAPL then moved to expand the scope of the proceeding beyond the limits described above and to reopen the record for further testimony. Before ruling on that motion the commissioners undertook a complete review of the record of evidence previously submitted.

On September 21, 1984, the commission issued the order that is the subject of this appeal. It unanimously decided to confine its inquiry to the limits that this court had upheld in *Appeal of Seacoast Anti-Pollution League supra*, and it was apparently unanimous in refusing to reopen the record. On the basis of that record, compiled before the order of August 28, 1984, a majority of the commission again granted the petition to approve the second step financing, subject to these conditions on the company's accounting and expenditure of funds: the company must file monthly accounts of the disposition of the proceeds of the financing; the company may not contribute more to the cost of new construction at Seabrook than its share of construction computed at the level of $5 million per week, unless otherwise authorized in the anticipated order on the Newbrook financing; the company may continue to service debt and allowance for funds used during Seabrook construction only until the date of the Newbrook order, but not thereafter unless specifically authorized; the company may not declare or pay preferred or common stock dividends without the commission's specific authority. On September 26, 1984, the commission supplemented this order by approving the pricing of the securities.

The intervenors SAPL and Campaign for Ratepayers' Rights filed motions for rehearing. The commission denied each motion, and these intervenors then brought the present appeal.

The appellants fault the commission for two asserted errors. They claim first that the commission erroneously limited its consideration of what the public good required. Specifically, they claim that the commission erred in failing to consider the effects of this financing over the long term on the company's capital structure and on its rates to be charged to customers. They claim, second, that the commission erred in refusing to reopen the record for further testimony.

Turning first to the scope of the commission's inquiry, the appellants argue that the commission ignored the potential effect of the exercise of the stock warrants on the ratio of debt to equity of the company's capital structure. This argument is factually correct. There is no question that the majority of the commission considered the effects of the financing on capitalization only for the short term, that is, the effect as it may be after the sale of the financing instruments but before the exercise of the stock warrants among those instruments. The majority confined themselves to noting that the expected short-term effects will result in a capital structure close to the norm for such utilities, of 50% debt, 15% preferred and 35% common stock. *See* A. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 209 (1969); *see also* E. NICHOLS & F. WELCH, RULING PRIN-

CIPLES OF UTILITY REGULATION—RATE OF RETURN 144 (Supp. A. 1964).

The appellants further argue that the commission failed to consider the likely effect of this financing on the rates that the company will ultimately charge customers. They claim that the commission violated its obligation under *Petition of the New Hampshire Gas & Electric Co.*, 88 N.H. 50, 184 A. 602 (1936), to determine whether the capitalization is consistent with reasonable rates. Again, there is no question that the commission deferred an inquiry on rate effect to a future hearing, noting that rate support need not follow the financing. At the least, we may say that this financing will increase pressure for higher rates, and that the commission will not address that pressure until it reaches the *Easton* inquiry to be held in connection with the Newbrook request.

In support of the commission, the company gives one answer to each of these arguments. The appellants' concerns about the debt-equity ratio and about the effect on rates are concerns about long-term effects of the financing. Yet *Appeal of Seacoast Anti-Pollution League supra* upheld the substance of the second procedural order, limiting the consideration to the short-term effects of the financing. After the second procedural order was vacated, the commission relied on *Appeal of Seacoast Anti-Pollution League supra* when it adopted the same limitation on the scope of its consideration this second time. Thus, the company submits, the appellants' arguments run squarely up against *Appeal of Seacoast Anti-Pollution League supra.* So long as that opinion stands, the appellants must lose.

This response is well taken. In *Appeal of Seacoast Anti-Pollution League supra* we sustained the merits of the very limitation that the appellants now attack. We found no error in the order that confined the inquiry to the short-term effects of this second step financing on capitalization. It is true that the arguments, and opinion, in that case were couched in terms of the commission's obligation to consider the economic alternatives to the company's completion of the first Seabrook reactor. But that consideration of economic alternatives necessarily includes a consideration of capital structure and rates, and what the appellants now claim as error is unquestionably consistent with our decision in the former appeal.

■ The commission was correct in relying on that recent precedent, and we have heard no persuasive reason to reconsider our earlier ruling. We reason today as we reasoned in *Appeal of Seacoast Anti-Pollution League supra* that the commission did not act illegally or unreasonably in the circumstances of this case when it chose to defer the *Easton* inquiry. Those circumstances include the small

amount of the financing that will go for new construction, and the very small proportion of that amount compared to the company's investment in Seabrook to date, of more than a billion dollars; the commission's finding of the risk, if not the certainty, of bankruptcy if consideration of this financing were to await an *Easton* hearing; and the existence of a genuine opportunity for an *Easton* hearing in the near future in connection with the Newbrook financing.

Whether or not the commission's decision to defer the *Easton* hearing was the only reasonable decision possible, at the least it was a reasonable decision. While neither the commission nor this court denies that the appellants' concerns deserve great weight, on the record before it the commission was entitled to defer consideration of those concerns to the next hearing.

Up to this point we have referred repeatedly to the record and the conclusions that the commission was entitled to draw from it. The appellants' second broad claim of error attacks the sufficiency of that record.

As we noted above, the commission compiled the record prior to its first decision to approve the financing, on August 28, 1984, which we later vacated. Thereafter the commission with its substituted member denied SAPL's motion to reopen the record.

The appellants maintain that this was error, because of two developments since the close of the record. The first has been the company's continued desire for approval of the present financing request, even though the date of the supposed *de facto* denial has long since passed. The second development was the company's disclosure, in a preliminary prospectus dated September 4, 1984, of cost and other projections differing from the projections offered in support of the financing request. The appellants argue that each development required the opening of the record for further evidence, without which the present order may not be sustained.

Turning to the failed prediction of the date of *de facto* denial, there is no dispute that two witnesses for the company did testify that the company would need approval of the financing by August 31, 1984, or the financing would come too late. August 31 has come and gone and the company still seeks the financing. The same two witnesses gave other testimony. The appellants argue that the witnesses' record of error about the *de facto* denial date puts their credibility generally in issue so as to infect all their other testimony.

The appellants assume that what they have described as an issue of credibility can be resolved only after hearing live testimony. Since the new member of the commission did not hear the witnesses, the appellants assert that the record must be opened and the wit-

nesses recalled, so that the new member can hear them and judge their credibility for himself.

In considering this argument, it is well to remember that we are not dealing here with an eyewitness' account of past events, but with expert witnesses' predictions about future conditions. We are not dealing with fact-finders whose job is only to determine what happened, but with expert administrative officials whose job is also to make predictions about the future, for the purpose of deciding what it would be reasonable to do.

It is true of course that the expert witness testifying to the expert official may lie, in the sense of making a prediction he does not believe to be sound, but not every failed prediction implies a lie. The characteristic problem about such testimony is not a credibility judgment about the eyewitness' truthfulness, but a reliability judgment about the odds that the expert's prediction will prove to have been accurate.

This distinction supports, though it does not necessarily limit, the general rule that an administrative officer may act on a written record of testimony by witnesses whom he has not personally seen or heard. *Colburn v. Personnel Commission*, 118 N.H. 60, 382 A.2d 907 (1978). *See Browning-Ferris Indus. v. State*, 115 N.H. 190, 339 A.2d 1 (1975). *See also* RSA 541-A:19 (Supp. 1983). This general rule may apply even in a case where experts are in conflict, when the choice of whom to believe is "a function of logical analysis, credentials, data base, and other factors readily discernible to one who reads the record." *New England Coalition v. U.S. Nuclear, Etc.*, 582 F.2d 87, 100 (1st Cir. 1978). By the same reasoning, the written record may support an evaluation of an expert when some of his testimony has come into conflict with later events.

We recognize an exception to this general rule, of course, when the record does not provide a reasonable basis for evaluating the kind of testimony in question. Then, a given administrative official's personal observation is necessary to evaluate testimony before an administrative tribunal. *See Opinion of the Justices*, 117 N.H. 386, 373 A.2d 644 (1977); *Gamble-Skogmo, Inc. v. Federal Trade Commission*, 211 F.2d 106 (8th Cir. 1954).

In this case the commission decided to follow the general rule by acting on the prior written record, even though its new member had not heard or seen the witnesses. We must uphold this decision unless it was a clearly unreasonable exercise of discretion. *See* RSA 541:13. Here there was a reasonable basis to trust to the record in judging the worth of the witnesses.

The commission had a record of more than four hundred pages of exhibits indicating the company's financial condition, its

problems with cash flow, and its agreements with creditors and investors. The commission could find that this evidence was a basis for deciding whether the failed prediction of the date had been egregious, and whether to accept the witnesses' further testimony about the feasibility of financing alternatives. Hence, we conclude that there was no error in failing to reopen the record, in spite of the failed prediction.

This brings us to a consideration of the second development that the appellants claim required a reopening of the record. It is undisputed that underwriters issued a preliminary prospectus for this financing, dated September 4, 1984. While the prospectus was not in the record and apparently was not a basis for the commission's majority decision, both the majority and the dissenting commissioner referred to it. The prospectus is not before us, but it is said to disclose that the company will require more capital to complete the first Seabrook reactor than its present financing request indicates, that the third step in financing will call for substantially more money, that the completion date for the first reactor will probably be later than expected, and that two bulk customers plan to seek power from other sources.

However significant these changes may be, if they are accepted, they do not call for the reopening of the record of this second step financing unless they affect the commission's determinations that speedy action is required on this request and that a genuine *Easton* hearing can appropriately be held in connection with Newbrook.

The changes appear to have neither effect. They have no bearing on the need for speedy decision. The company's financial exigencies are obviously no less pressing if we assume that Seabrook's costs will be up and demand for its power will be down.

Nor will the changed projections, if accepted, render academic the coming *Easton* hearing on the future of the company's participation in Seabrook construction. To the contrary, the new projections will be highly material in assessing the relative desirability of completing or abandoning the first reactor. Indeed, our brothers in dissent do not claim that the changed projections would render a later *Easton* hearing an empty exercise. They argue, rather, that the prospect of such changes demands an *Easton* inquiry without further delay. Their dissent brings us to the nub of our disagreement. We believe that the commission had a sustainable basis in the evidence for two conclusions: that the company could not survive an *Easton* hearing without substantial financing and that the financing as proposed is the only financing with a reasonable chance of success. It is the acceptance or rejection of these conclu-

sions that divide us in this appeal, as in the last one. Because we in the majority do accept those two conclusions, we hold that the appellants have not met their burden to demonstrate that the commission was acting unlawfully or unreasonably in refusing to postpone its decision on this petition, in order to reopen the record for evidence of the changed projections.

■ Although this discussion resolves the appeal, we would not conclude this opinion without a word about the requirement of what we have come to call the *Easton* inquiry. Despite the differences that divide the court in this case, we should note that the court is unanimous in its understanding of the requirement imposed by *Appeal of Roger Easton*, 125 N.H. 205, 480 A.2d 88 (1984). The holding in that case will require the commission to determine the relative economic desirability of allowing or disallowing the company's continuing participation in construction of the first Seabrook reactor, before it rules on the anticipated third or Newbrook financing request.

■ Our opinion has referred to some of the issues that the commission must address in the course of its *Easton* inquiry. As an example, we remind the commission that *Petition of the New Hampshire Gas & Electric Co.*, 88 N.H. 50, 184 A. 602 (1936) held that "the primary public interest may be found to be affected injuriously" "if it appears, upon all the evidence, that the capitalization sought is so high that the utility, because of [its] inability to earn operating costs, depreciation and other charges, will not be able to give its consumers at reasonable rates the service to which they are entitled . . . ." *Id.* at 57, 184 A. at 607. Therefore, in the Newbrook proceeding the commission must address the effect on the company's future rates of this and any further investment, with findings of fact sufficient for genuine appellate review.

Whatever the commission's findings and the ultimate *Easton* determination may be, they must rest on the record of a substantial inquiry. Just as the commission must give a reasonable amount of time to the *Easton* proceeding, so this court must do the same if an appeal is subsequently taken. Therefore, none of the parties should take the expedited consideration that the commission and this court have given to this second financing request as precedent for seeking to truncate the *Easton* inquiry or any review of its results.

### Part II (April 12, 1985)*

In its appeal, SAPL raised the question, with respect to public

---

* By supplemental order issued with its opinion in this case on November 27, 1984,

utility securities issued under an effective, unsuspended public utilities commission order pending appeal of that order, "[w]hether, in the event this Court should hold the order appealed from was unlawful, or unreasonable or unjust, the securities issued pursuant thereto would remain valid."

Our holding in Part I would normally make it unnecessary for us to address this issue. It appears, however, that the question posed by SAPL in this case is one that is likely to arise again not only in other unrelated financing proceedings, but also with respect to financing proposals related to this one, which are presently being considered by the commission. Accordingly, in the interests of conserving judicial resources and judicial economy we will address the issue now. *See Saltzman v. Town of Kingston,* 124 N.H. 515, 520–21, 475 A.2d 1, 4 (1984).

The only authority we have found dealing directly with this issue is *State ex rel. Wisconsin Electric Power Co. v. Bardwell,* 71 Wis. 2d 718, 239 N.W.2d 78 (1976). In *Bardwell,* a power company's financing proposal was approved by the Wisconsin Public Service Commission (PSC), the equivalent of the PUC here. Intervenors then petitioned a Wisconsin trial court for a stay or a reversal of the approval order, which were both denied. The utility then sought a declaratory judgment from the Wisconsin Supreme Court that the securities involved in the proposal would be valid when issued, regardless of the ultimate outcome of any appeal of the PSC's authorizing order.

The Wisconsin Supreme Court accepted original jurisdiction and essentially granted the requested relief. It held that "unless a stay is granted, the securities may be issued . . . . Once issued, they are valid." *Id.* at 728, 239 N.W.2d at 84. While the PSC's approval of the issue might be overturned on appeal, "any appropriate judicial remedy . . . should be directed toward the *use* of proceeds of the bonds, rather than the *validity* of the bonds themselves." *Id.* at 729, 239 N.W.2d at 85 (emphasis added).

The *Bardwell* court based its holding on the language of the Wisconsin statutes governing the issuance of securities by public service corporations. Those statutes prohibit "the issuance of securities for any purposes which are not proper corporate purposes, or in an amount greater than is reasonably necessary for such corporate purposes . . . ." WIS. STAT. § 184.03 (1) (1981–82). They also require, as a prerequisite to issuance, a PSC finding "that the financial con-

---

the court deferred a decision on enlarging the scope of the appeal to include an issue relating to the validity of certain public utility securities in the hands of purchasers. That issue is addressed in Part II.

dition, plan of operation and proposed undertakings of the corporation are such as to afford reasonable *protection to purchasers of the securities* to be issued . . . ." WIS. STAT. § 184.06(1) (1981–82) (emphasis added).

The court noted that under the Wisconsin statute the filing of an appeal from the order authorizing the financing would not of itself stay the issuance of the bonds. *Bardwell*, 71 Wis. 2d at 728, 239 N.W.2d at 84. It concluded that the clear legislative intent to protect investors could not be fulfilled unless the bonds were deemed valid when issued, and that "the public interest [*i.e.*, that of "consumer/ ratepayers or the public at large"] is to be protected by means other than subsequent invalidation of the securities." *Id.* at 727, 239 N.W.2d at 84.

■■ The procedure by which the issuance of public utility stocks, bonds, and other securities is authorized in New Hampshire is similar to that in Wisconsin. The criteria for approval of an issue, however, have a different emphasis. In New Hampshire, the commission must find that "the proposed issue and sale of securities . . . is *consistent with the public good.*" RSA 369:1 (emphasis added). Additionally, this court has previously stated that the protection of investors' interests must be "secondary" to the "primary concern of the commission," which is "the protection of the consuming public." *Petition of the New Hampshire Gas and Electric Co.*, 88 N.H. 50, 57, 184 A. 602, 607 (1936).

■ That having been said, the question remains whether protection of the public interest will ever require that bonds be invalidated if the order authorizing their issuance is overturned on appeal after the bonds have been issued. As we interpret our statutes, the legislature has already answered this question in the negative; it has instead clearly provided that the public good is to be protected by means other than post-issue invalidation.

■ Two statutes currently provide for the possible suspension of commission orders. RSA 541:5 provides that the commission itself may suspend an order, "upon such terms and conditions as the commission may prescribe," pending consideration of a motion for rehearing. Under that provision, the commission, within ten days of the filing of a motion for rehearing, must grant or deny the motion, or suspend the order pending further consideration. *Appeal of Concord Natural Gas Corp.*, 121 N.H. 685, 690–91, 433 A.2d 1291, 1295 (1981). The ten-day period is purposely short to avoid a protracted period of *de facto* suspension. The statute represents a legislative determination that ten days is *per se* a reasonable period in which

the commission can determine its action on the motion for rehearing without risk of the parties changing their position. The rehearing offers the parties, both intervenors and utilities, their first and only opportunity to convince the commission that an error has been made. The commission's initial order should not be deemed a valid authorization until the rehearing is completed.

RSA 541:18 reads, in pertinent part:

> "No appeal or other proceedings taken from an order of the commission shall suspend the operation of such order; provided, that the supreme court may order a suspension of such order pending the determination of such appeal or other proceeding whenever, in the opinion of the court, justice may require such suspension . . . ."

We take this to reflect a legislative determination that any significant threat to the public interest, stemming from a commission order authorizing the issuance of securities whose propriety has been questioned, should be dealt with by means of a suspension. An unsuspended commission order becomes effective upon completion (or denial) of rehearing, unless a request for temporary suspension or stay pending appeal is properly filed with, and granted by, this court.

We need not decide whether RSA 541:18 authorizes this court to suspend a commission order *before* the commission has ruled on a motion for rehearing. The statute is ambiguous on this point, but the speed with which the commission is required to act, RSA 541:5, makes it unlikely that the issue will ever arise in practice.

Appeals to this court, however, may sometimes not be resolved for many months. This fact may have serious consequences for a public utility that is relying on its ability to issue securities within a few days of receiving commission approval, as is customary practice.

As the *Bardwell* court pointed out, the mere possibility that securities issued pursuant to a financing order will later be invalidated acts as a *de facto* suspension of the order authorizing their issue, by placing the securities in an "unfavorable competitive position." *Bardwell*, 71 Wis. 2d at 725, 239 N.W.2d at 83. To interpret our statutes as allowing this possibility would render meaningless the language in RSA 541:18 providing for suspension of orders in securities cases.

Whether or not a suspension is required will depend on the facts and circumstances of the particular case. SAPL correctly points out that there are limits to the commission's authority under RSA 369:1 to impose conditions on the use of financing proceeds. We have emphasized, however, that "[t]he PUC is nevertheless still free to

attach reasonable conditions to any future financings under RSA 369:1 as it properly finds to be 'necessary in the public interest.'" *Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1072, 454 A.2d 435, 441 (1982).

▆▆▆ We accordingly see no reason in principle why the commission cannot impose such conditions to the authorization of financing instruments or the use of financing proceeds, to be effective during the pendency of an appeal, as would be necessary and sufficient to protect both the purchasers of the securities and the ratepaying public in the event that this court ultimately determined that the financing order was unlawful. Whether the limits on the commission's authority to impose such conditions, or the commission's failure to impose them, will ever make suspension of a financing order pending appeal the only practicable means of protecting the ratepaying public, or whether conditions the commission may impose will make suspension unnecessary, is, under RSA 541:18, a matter left to the discretion of this court. Such a question must be answered in the context of a particular case.

The legislature specifically recognized the need to protect purchasers of securities when it enacted RSA 382–A:8–202(2)(a), which reads:

> "A security other than one issued by a government or governmental agency or unit even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect."

▆▆▆ The mere possibility that an order authorizing the issuance of securities may, many months later, be overturned on appeal, when neither the commission nor this court has suspended the order, or when no suspension was sought, does not amount to notice of a defect *per se*. A purchaser for value who has notice only of the appeal is thus protected by the statute. To hold otherwise would be to permit an appealing party to usurp the role allocated to this court by RSA 541:18; every appeal would create a "defect" that would effectively suspend the operation of an issuing order by casting doubt on the subsequent validity of the securities issued, thereby making them unmarketable or substantially reducing their market value.

We cannot agree with the dissenters that this holding will create

"a number of practical problems." As is evident from the scarcity of precedent, the question involved here does not arise often. Indeed, it is a development of recent origin in this State that parties have sought to use financing proceedings to challenge collaterally prior orders or rulings of the commission which have either not been appealed or the appeal from which has been resolved. Few proposed issues of securities encounter the degree of opposition present in this case; nor is it often so vital to the issuing utility that an issue be approved promptly. In the vast majority of cases, the utility will delay issuing the securities until after the appeal is resolved, thus avoiding all of the problems mentioned in the dissent.

We accordingly hold that securities issued pursuant to an unsuspended financing order are valid in the hands of purchasers when issued by the utility, and will not be invalidated by any reversal of the order on appeal. Our holding does not assure that the costs of securities will ultimately be recovered through rates charged to customers. When a utility has exhibited inefficiency, improvidence, economic waste, abuse of discretion, or action inimical to the public interest, the costs incurred may not be passed on to the ratepayers. *See Appeal of Public Serv. Co. of N.H., supra* at 1076, 454 A.2d at 443.

*Affirmed.*

KING, C.J., and BATCHELDER, J., dissented.

KING, C.J., dissenting in Part I: RSA 369:1, :4, requiring PUC approval for the issuance of securities by regulated utilities, have been in force since 1911. The purpose of the statute is clearly set forth in *Petition of the New Hampshire Gas & Electric Co.*, 88 N.H. 50, 184 A. 602 (1936), where this court stated:

"The primary concern of the commission in ascertaining the public interest for purposes of capitalization is the protection of the consuming public. An undercapitalization desired by the utility will probably not adversely affect the public interest in the usual case. But if it appears, upon all the evidence, that the capitalization sought is so high that the utility, because of inability to earn operating costs, depreciation and other charges, will not be able to give its consumers *at reasonable rates* the service to which they are entitled, then the primary public interest may be found to be affected injuriously."

*Id.* at 57, 184 A. at 607 (emphasis added). Therefore, the court held that, "[t]here is no question that the object of the statute is to avoid

overcapitalization contrary to the public interest." *Id.* at 55, 184 A. at 605.

In order to determine whether the overcapitalization was detrimental to the public, the court added:

"A prime test is not to permit the capital issues to exceed, at least so much as to affect the public interest materially, the fair cost of the property reasonably requisite for present and future use, plus necessary working capital and any other authorized requirements."

*Id.* at 55, 184 A. at 605.

In *Appeal of Easton*, 125 N.H. 205, 480 A.2d 88 (1984), this court reaffirmed the basic holding of the *New Hampshire Gas & Electric* case. We ". . . endorsed a searching role for the commission in scrutinizing company submissions . . . .", pursuant to RSA chapter 369. *Appeal of Easton, supra* at 211, 480 A.2d at 90. We repeated the language of the *Petition of the New Hampshire Gas & Electric Co.*, 88 N.H. 50, 184 A. 602 (1936), that "'[a] prime test is not to permit the capital issue to exceed, at least so much as to affect the public interest materially, the fair cost of the *property reasonably requisite for present and future use* . . . .'" *Appeal of Easton, supra* at 211, 480 A.2d at 90. Under RSA chapter 369 and this court's decisions, financing authorization must be preceded by a judgment concerning its impact on the public interest as determined by examining the effects of the proposed capitalization.

Public Service Company of New Hampshire does not claim that the money borrowed is needed to meet present needs. Further, it proposes to invest the pre-financed proceeds in order to obtain earnings which will be less than the cost of the borrowing. The majority of the PUC defends the authorization by asserting that the financing is necessary to restore Public Service Company of New Hampshire's financial liquidity. The majority found that the resolution of the liquidity crisis through this unprecedented indebtedness was in the public interest. This conclusion was not evidentially supported either by qualified experts, or by reliable statistical data.

The majority of the PUC, through the testimony of the utility's two witnesses, found that the Public Service Company of New Hampshire financing, totalling 425 million dollars, was "in the public good". Considering the terms, conditions and amount of the proposed financing, the commission found that the public good was served because there was a need to restore the liquidity of the utility in order to protect the investment in Seabrook.

The long-range implications of authorizing a borrowing of up to 425 million dollars by Public Service Company of New Hampshire

at an annual cost of more than 21% (including brokerage fees), where the amount to be borrowed almost equals the 1984 rate base of 455 million dollars, are staggering. This borrowing is more than four times the amount of the largest financing in the history of Public Service Company of New Hampshire. Nevertheless, the commission held that its initial inquiry would review this financing solely in light of its short-term capital effects on the company, without regard to the ultimate demands that such a financing would make on the company's customers. The amount of revenue necessary to support this financing was not determined. Such a limited inquiry prior to authorization is contrary to the purpose of RSA chapter 369.

The commission decided to defer the consideration of long-term issues of financial feasibility, capital structure and rate effect, to its pending docket DF 84–200. Admittedly, this PUC financing authorization in itself creates no immediate impact on rates; however, rates will be affected when the capitalization represented by this financing is actually included in the company's capital structure. Inclusion of this capitalization will most likely occur in a subsequent rate case.

The issues of financing Seabrook should have been considered in this case and not deferred to another docket, DF 84-200, to be heard later. As important as the survival of the utility may be, the effect of the financing on the ratepayers is equally important. The protection of the ratepayers is the basis for the requirement of an inquiry into the public interest prior to financing authorization, pursuant to RSA 369:1, :4.

Lack of concern for the ratepayers was expressed by one of the two witnesses who testified for the utility in support of the need for the 425 million dollar financing, when he stated that he was not testifying as to "what the effects of the financing in any way will be on rates for the people of New Hampshire." Such effects should be considered at this time by the commission.

In *New England Telephone & Telegraph Co. v. State*, 104 N.H. 229, 183 A.2d 237 (1962), this court held:

> "In fixing such rate of return the cost of capital is an important factor to be determined and considered by the Commission in 'the exercise of a fair and enlightened judgment, having regard to all relevant facts' . . . . [In addition, the interest] of the investor [is] to be considered by the Commission together with the interest of the consumer in arriving at just and reasonable rates."

*Id.* at 234, 236, 183 A.2d at 241, 243 (citing *Chicopee Mfg. Co. v. Company*, 98 N.H. 5, 11 (1953) and *Power Comm'n v. Hope Gas Co.*,

320 U.S. 591, 602 (1944)). A failure to consider these factors in authorizing a financing, even initially, can only be considered error in light of the purpose of RSA chapter 369 and this court's decisions. Given the magnitude of this financing, the gravity and immensity of the PUC's error is apparent.

This court should remand this case to the commission for findings as to how the financing proposed by the utility is consistent with the public good. RSA 369:1.

BATCHELDER, J., dissenting in Part I: I dissent from the majority opinion upon matters of procedure and substance.

Today's decision is expedited in response to a request for an early decision. This request was submitted as part of the appellee's brief filed on the Friday preceding a Monday argument. The request was supported by an affidavit of an official of Public Service Company of New Hampshire (PSNH), predicting dire financial consequences unless a decision favorable to the company in this appeal was rendered five business days prior to November 30, 1984, which in this case was four days after oral argument.

Such a request should have been the subject of a motion more timely filed, and the factual support should have been subject to examination by the appellants, as well as a hearing, if requested. Such a procedure would have honored the rights of the appellants and would have been more in keeping with this court's judicial responsibilities. In the absence of such a procedure, the court is responding to a factual assertion by a party, when such facts are not contained in the record. The granting of this request diminishes to a marked degree the opportunity for the kind of analysis and examination of the record that a financing of this magnitude demands. The majority thereby establishes, in my view, a precedent of far-reaching consequences. Must the court now respond to similar requests in other cases, and, if so, upon what fulcrum do we balance the competing merits of such a request?

An issue raised by this appeal which is yet to be resolved is whether securities authorized by the public utilities commission (PUC) remain valid obligations of PSNH notwithstanding appellate review of the authorization. *See State ex rel. Wisconsin Elec. Power Co. v. Bardwell,* 71 Wis. 2d 718, 239 N.W.2d 78 (1976). Due to the expedited nature of the disposition of this case, the majority has chosen to defer resolution of this important issue to a later date, resulting in a bifurcation of this opinion. In general, a practice of rendering installment opinions should not be encouraged.

In this case, in particular, deferring the issue to a separate installment is a mistake. PSNH in its brief in this case anticipates the near future of the three-phase financing in the following language:

"In the event necessary regulatory approvals are subsequently obtained to allow the Seabrook owners to increase the level of Seabrook construction expenditures above $5 Million per week, PSNH will be faced with a cash requirement which cannot be met from the proceeds of the present financing, under the terms of the PUC's authorizing Order in this case. In that event, time may once again become of the essence with respect to issuing the 'Newbrook' securities and obtaining the proceeds to meet increased construction obligations. It follows that determination of the 'Bardwell' issue in this case, where it is now clearly the subject of adversary contention, will become directly applicable to the course to be followed in the Newbrook case, already under way."

The Newbrook case may be underway, but testimony is not to commence until December 3, and will presumably take weeks or months to complete. The outcome of that docket, DF 84-200, is speculative both as to result and time. Under the existing agreement among the participating utilities in the Newbrook enterprise, PSNH's portion of funds to complete the project must be prefinanced or "in the bank" by December 31, 1984, or by February 28, 1985, in the event the participating utilities agree to such an extension. Because of this rush of events, I believe the parties are entitled to have the *Bardwell* issue resolved in *this* financing and not deferred to a later date.

Turning to the substantive issues in this appeal, it must be recognized that this financing is the second phase in a three-phase package designed to reestablish PSNH's financial integrity. Each step is interrelated with and depends upon the other two. The third stage has been styled the "Newbrook" plan.

The PUC may approve a proposed issue and sale of securities only after it has determined that the financing is consistent with the public good. RSA 369:1, :4. In *Appeal of Roger Easton*, 125 N.H. 205, 211, 480 A.2d 88, 90 (1984), we held that the PUC may not confine its inquiry solely to a financing's terms, but must consider the financing in light of all the surrounding circumstances. In *Appeal of Seacoast Anti-Pollution League*, 125 N.H. 465, 482 A.2d 509, (1984), a majority of this court held that an "*Easton* review" of PSNH's overall financing plan could be deferred until the time of the separate proceeding to consider the Newbrook proposal. *Id.* at 474, 482 A.2d at 516. The court further ruled, however that:

"when there are reasonable grounds to believe that [material] facts have changed, the commission has a duty to recon-

sider prior determinations of the public interest that may have been rendered obsolete. When such reasonable grounds exist, the PUC cannot refuse to make the required inquiry by postponing it until after a financing decision, that might render it academic."

*Id.* at 474, 482 A.2d at 516.

This language in *Appeal of Seacoast Anti-Pollution League* required the reconstituted PUC to monitor carefully changes in circumstances. Given PSNH's precarious financial condition and the proposed financing's magnitude, the PUC was obligated to reconsider its position upon any significant change of circumstances. I believe that the appellants have sustained their burden in establishing two such changes, and I therefore conclude that the commission erred in refusing to reopen the record and reevaluate the financing in light of these changes.

First, the projected cost of long-term debt securities to be sold by the Newbrook company in the final financing phase has been increased to $730 million from $350 million. This added cost, though facially not a matter of concern until the Newbrook financing phase, increases the risk for investors inherent in the present financing phase, and therefore increases the cost of this financing.

Second, two of PSNH's wholesale customers, Exeter & Hampton Electric Company and Concord Electric Company, notified PSNH that they intend to terminate their power purchase contracts as of September 30, 1986. These companies currently account for 11% of PSNH's total power sales and 8% of PSNH's total revenues. Their loss as customers may lower significantly the demand on PSNH for electric power and force even greater increases in rates to fund this financing.

In ordinary circumstances, such changes might not require a widening of the commission's scope of review. However, when viewed in the light of the size of this financing, the proposed record interest rates in excess of 20%, and the financial plight of PSNH, these changes required the strictest PUC scrutiny. Commissioner Aeschliman in her separate opinion in the September 27 order recognized the significance of these changes, stating: "These two new facts are directly relevant to the feasibility of the Company's financing plans and to the amount of financing that should be approved in this docket given the emergency nature of the proceeding and the limited scope." The remaining members of the PUC, however, refused to reevaluate the commission's position in light of these changes and thereby avoided a determination whether the financing was consistent with the public good.

This financing involves aspects of debt and equity. Where capitalization is involved, this court has held that "[t]he primary concern of the Commission in ascertaining the public interest for purposes of capitalization is the protection of the consuming public." *Petition of the New Hampshire Gas & Electric Co.*, 88 N.H. 50, 57, 184 A. 602, 607 (1936). Accordingly, the commission may not approve a financing which threatens to increase utility rates unreasonably. As we stated in *Petition of the New Hampshire Gas & Electric Co.*, "if it appears, upon all the evidence, that the capitalization sought is so high that the utility, because of [its] inability to earn operating costs, depreciation and other charges, will not be able to give its consumers at reasonable rates the service to which they are entitled, then the primary public interest may be found to be affected injuriously." *Id.*

This financing of $425 million is four times larger than any previous financing of the company. Payment of the debt portion of this financing and of dividends to holders of the equity portion will require PSNH to generate significant new revenue. The likelihood of rate increases is clear and undisputed. The extent of these increases may well be affected by the two changes in circumstances.

The majority today relies in part upon the commission's findings relative to the short-term effects of this financing. Debentures which mature in the year 2004 and warrants for the purchase of up to 22.5 million shares of common stock exercisable for 7 years are not short-term. The long-term effect on the company's capital structure by virtue of the issuance of warrants for purchase of 22.5 million shares of common stock has not been analyzed, nor, according to the PUC majority, will it be examined even in DF 84-200. When, under *Easton* and *New Hampshire Gas and Electric*, will such an examination occur? A bell having been rung cannot be unrung.

PSNH, without the present financing, is admittedly on the threshold of bankruptcy. By refusing to recognize the changed circumstances in this case, the PUC did not heed the language of the majority in *Appeal of Seacoast Anti-Pollution League supra*, and has deferred to another day the root question which should have been the focus of this financing review: namely, the wisdom of PSNH's continued participation in the Seabrook project.

The statutory role of the commission is that of an "arbiter between the interests of the customer and the interests of the regulated utilit[y]." RSA 363:17-a (Supp. 1981). This role has not been fulfilled in this financing. Today's crisis has now become tomorrow's crisis.

For these reasons, I would remand this docket to the PUC for an *Easton* hearing, which is why I joined the chief justice in his dissent

in *Appeal of Seacoast Anti-Pollution League supra* and why I dissent today.

KING, C.J., and BATCHELDER, J., dissenting in Part II: The Seacoast Anti-Pollution League as part of its appeal raised the question whether securities issued pursuant to an unsuspended New Hampshire Public Utilities Commission (PUC) order remain valid in the hands of purchasers notwithstanding subsequent appeals or the results of those appeals. The majority has concluded, as urged by Public Service Company of New Hampshire (PSNH), that our statutes require a sweeping declaration of the rights of future litigants, utilities and investors. PSNH cites as its only authority for this unusual request a Wisconsin Supreme Court decision, *State ex rel. Wisconsin Electric Power Co. v. Bardwell*, 71 Wis. 2d 718, 239 N.W. 2d 78 (1976), which interpreted certain Wisconsin statutes: namely, WIS. STAT. §§ 184.03, 184.06, 184.08 (1983–84).

We dissent from the majority holding for the following reasons: (1) the majority has misconstrued the applicable appeal statutes; (2) the holding is contrary to the public good; (3) the question presented to this court is premature because no factual record exists to substantiate PSNH's claim; and (4) the rule announced creates a number of practical problems.

I. *The Majority Misconstrues the Appeal Statutes and Grants Excessive Relief*

RSA 541:18, upon which the majority bases its reasoning, does not support the majority's conclusion that this court may not invalidate securities issued pursuant to an unsuspended PUC authorization. RSA 541:18 states that "[n]o appeal or other proceedings taken from an order of the commission shall suspend the operation of such order . . . ." It accordingly states that a commission order is not legally suspended by the mere existence of a pending appeal. PSNH has not claimed that a legal suspension of the PUC order has occurred, but instead argues that a *de facto* suspension of the PUC order would occur as a result of impaired marketability of the securities occasioned by the possibility of an appeal of the PUC authorization. RSA 541:18 does not address such a *de facto* suspension.

RSA 541:18 authorizes this court to suspend a commission order where "justice may require such suspension." The statute liberalizes the standard for what would otherwise be an extraordinary writ. *See, e.g., Forrest v. State Personnel Comm'n*, 116 N.H. 203, 358 A.2d 408 (writ of certiorari granted sparingly and only when substantial ends of justice require); *American Fed'n of Employees, Local 572 v. Dover*, 115 N.H. 491, 345 A.2d 912 (1975) (writ of prohibition avail-

able only upon clear necessity). This authorized suspension power should not be read as a mandate to declare rights of parties acting in reliance upon an unsuspended commission decision.

The power to suspend under RSA 541:18 is designed to aid the court in preserving the status quo pending appeal so that, on appeal, it may achieve the most just result. *New Hampshire Milk Dealers' Ass'n v. N.H. Milk Control Board*, 107 N.H. 150, 151–52, 218 A.2d 363, 364 (1966). The court should not construe the statute as mandating a declaration of rights which forecloses the court's ability to invalidate securities pursuant to an appeal on a case by case basis. *See id.* at 151, 218 A.2d at 364 (determination whether the order should be invalidated can be done properly only when the transcript is available and case is argued on its merits on appeal).

The breadth and finality of the majority's holding precludes other forms of relief available to this court, RSA 490:4, and abdicates the responsibility of this court as factual situations present themselves in the future.

## II. *The Majority's Holding is Contrary to the Public Good*

The request by PSNH that this court declare the securities valid despite subsequent appeals is contrary to the express statutory purpose of assuring that the issuance of securities is consistent with the public good. RSA 369:1 (authority of PUC to issue securities).

The Wisconsin statute at issue in *Bardwell* is not, contrary to the majority's analysis, substantially similar to the New Hampshire statute. All that the Wisconsin statute requires for commission approval is a finding that the issuance is not for "any purposes which are not proper corporate purposes, or in an amount greater than is reasonably necessary for such corporate purposes, having in view the immediate requirements of the corporation and its prospective requirements over a reasonable period in the future, and other relevant considerations." WIS. STAT. § 184.03 (1983–84); *see Bardwell*, 71 Wis. 2d at 725–26, 239 N.W.2d at 83.

This amounts to little more than considering the propriety of the *terms* of the financing, the same position which we so strongly rejected in *Appeal of Easton*, 125 N.H. 205, 213, 480 A.2d 88, 91 (1984) when we said "[T]his court long has held that the PUC has a duty to determine whether, under all the circumstances, the financing is in the public good—a determination which includes considerations beyond the terms of the proposed borrowings."

Wisconsin's statute specifically requires the Wisconsin Public Service Commission to find that the financial condition, plan of operation, and proposed undertakings provide reasonable protection to investors. WIS. STAT. § 186.01(1) (1983–84). The Wisconsin statute

had to be interpreted by the *Bardwell* court to evidence a legislative intent to protect consumers:

> "This is not to say that consumer/ratepayers or the public at large are not to be protected from the consequences of an erroneously granted certificate of authority. The very fact that a review by the PSC is required, and the nature of the findings which must be made, including that of 'proper corporate purpose[s]' indicate the intent that the public interest is to be protected."

*Bardwell*, 71 Wis. 2d at 727, 239 N.W.2d at 84 (quoting WIS. STAT. § 184.03) (citation omitted).

The *Bardwell* court deemed the protection of purchasers of securities to be a major purpose of the Wisconsin statute. It therefore declared that the securities were valid when issued. *Id.* at 727, 239 N.W.2d at 84. The public was relegated to protection by means other than subsequent invalidation of the securities. *Id.*

By contrast, in New Hampshire protecting the public good is of paramount importance. *See* RSA 369:1, :4. Protection of investors has never been elaborated as a relevant concern in this State. The language relied upon by the majority for the protection of investors is scant authority at best. *See Petition of the N.H. Gas & Electric Co.*, 88 N.H. 50, 57, 184 A. 602, 607 (1936) ("Whether there is any secondary interest of the public requiring protection such as that of investors, we are not called upon by the questions presented to decide." (Citation omitted.)) To equate the considerations underlying a dissimilar Wisconsin statute with the policies reflected under New Hampshire law is a faulty basis for granting the *Bardwell* relief sought by PSNH.

The majority's position is particularly troubling in light of the deferral of a full *Easton* review of this financing. We held in Part I that the PUC could defer consideration of alternatives to Seabrook and the long-term effect on capitalization of the $425 million financing request to its *Easton* review of Phase 3, the Newbrook Phase. A public good determination of Phase 2 securities has never been completed. *See Appeal of Easton*, 125 N.H. 205, 212–13, 480 A.2d 88, 91 (1984).

Nevertheless, under the majority's holding, the securities issued to date in Phase 2 will be valid irrespective of whether this financing is determined to have been in the public good. The public does not benefit from such a judicial limitation of the intervenors' right to challenge by appeal the validity of a PUC order. Such a premature limitation by this court of a future appeal is not consistent with the public good.

III. *No Factual Record Supports the Majority's Holding*

PSNH argues that, unless this court declares that the securities are valid when issued, the securities will "be rendered completely unmarketable" during the statutory appeals period and thus that the PUC authorizing order will be "constructively suspended" during this period. The PUC has made no factual findings that support these claims. The majority, however, holds that the "unfavorable competitive position" of the securities requires that they be immune to appellate invalidation. The majority thus accepts as true the bald assertions of PSNH. The majority's failure to require administrative resolution of the factual issues of this case contravenes State and federal constitutional law and the holding of *Petition of Public Serv. Co. of N.H.*, 125 N.H. 595, 484 A.2d 1139 (1984).

Parties opposed to the securities' issuance have a due process property interest in the resolution of the factual issues of this case in accordance with State law. *See Logan v. Zimmerman Brush Co.*, 445 U.S. 422, 429–31 (1982); *Public Utilities Comm'n v. Cole's Express*, 138 A.2d 466, 470–72 (Me. 1958). Under New Hampshire law, the merits of PSNH's factual assertions should be determined by the PUC in accordance with RSA chapter 541-A (Supp. 1983), not by this court. *See Appeal of Kingswood Trust & Savings Bank*, 123 N.H. 7, 12, 455 A.2d 1027, 1030 (1983). The majority's acceptance of PSNH's factual assertions denies opposition parties, procedural due process by impairing their appellate rights without an opportunity to be heard on the factual basis for the decision, *see Logan supra; Cole's Express supra;* the majority's resolution of this case without an adjudicated factual basis violates notions of substantive due process, *see Black v. Sullivan*, 561 F. Supp. 1050, 1061 (D.Me. 1983); and the majority's discrimination against these parties without a legitimate factual basis for doing so denies them equal protection of the laws, *see Gazzola v. Clements*, 120 N.H. 25, 29, 411 A.2d 147, 151 (1980); N.H. CONST. pt. I, art's 1, 2, 14; U.S. CONST. amend. XIV.

In *Petition of Public Serv. Co. of N.H. supra*, PSNH sought by original petition to have us decide the precise question now before us. We dismissed the petition for lack of a justiciable controversy. We noted, however, that we could properly address the question if it arose in the context of the PUC's ongoing consideration of docket DF 84-167. In that instance, the question would state a justiciable controversy predicated on factual findings of the PUC. Our opinion states:

"We can only say that it could be possible for the PUC to transfer and for us to answer a question such as the present one if docket DF 84-167 should be reopened for the bona fide purpose of considering such a matter upon proper notice and opportunity to create a testimonial record."

*Petition of Public Serv. Co. of N.H.*, *supra* at 599, 484 A.2d at 1142. Since the PUC has not made any factual findings regarding the marketability of these securities, a decision on the merits is, in this regard, as objectionable as it was last October.

### IV. *Practical Problems Resulting From the Majority Holding*

The majority holding imposes an additional burden on prospective appellants beyond merely filing and litigating an appeal. An appellant will now have to seek immediate suspension of a PUC authorization or else face the risk that the securities will be issued, and once issued will be valid. This burden was not contemplated by RSA 541:6, which gives appellants thirty days to review their positions and to determine whether to appeal. The result will be not only motions to suspend pending appeal, but also motions to stay pending determination of suspension, and original petitions to preserve the status quo pending the filing of notices of appeal in this court. *See* RSA 490:4.

Under the majority holding, a utility which chooses to issue securities, valid in the hands of purchasers, before resolution of the PUC authorization, takes a significant risk that the authorization may ultimately be held defective. While the majority forecloses invalidating those securities as to the issuer and purchaser, after today's decision, one of the factors to be scrutinized in a rate case will be whether the *added risk* of issuing securities before a final determination of the public good was a justified and prudent action. Such a finding of an unjustified risk would bar recovery of the financing costs in rates.

RSA chapter 369 is designed to protect the public good. RSA chapter 541 provides for review and appeal of agency decisions. If greater specificity in these two statutes is required to balance the economic and policy concerns in public utility securities offerings, such fine tuning should be done legislatively, and should be based upon legislative hearings and an established legislative policy. This court should decline to decide the effect of a PUC order authorizing issuance of public utility securities before that order becomes final. Instead, our review should be limited to those procedures clearly established by statute.

Accordingly, we would deny the declaratory relief sought by PSNH and leave to bond counsel all speculation as to the effects of the pending appeal process on the issuance of public utility securities.