Public Utilities Commission
No. 92-289

APPEAL OF EASTMAN SEWER COMPANY, INC.
(New Hampshire Public Utilities Commission)

January 27, 1994

*Castaldo, Hanna & Malmberg, P.C.*, of Concord (*David W. Marshall* on the brief and orally), for Eastman Sewer Company, Inc.

*Jeffrey R. Howard*, attorney general (*Harold T. Judd*, senior assistant attorney general, and *Susan Chamberlin*, staff attorney for the New Hampshire Public Utilities Commission, on the brief, and *Daniel Mullen*, assistant attorney general, orally), for the State, as *amicus curiae*.

BATCHELDER, J.   Eastman Sewer Company, Inc. (sewer company) appeals the orders of the New Hampshire Public Utilities Commission (PUC) excluding nearly all of the cost of the sewer system from its rate base for ratemaking purposes. It argues that the PUC's orders are not supported by the evidence, constitute an unconstitutional taking, ignore a valid capital lease, and result in confiscatory and unlawful rates. We affirm.

In the early 1970's, Controlled Environment Corporation (CEC) commenced development of Eastman, a four-season community in Grantham. The construction of a sewer system was one of its undertakings. The sewer company, a wholly owned subsidiary of CEC, has provided sewer service to certain Eastman residents since 1974. In 1982, CEC leased the sewer system to the sewer company.

At the time of the sewer company's initial operation, public utility regulation laws did not apply to the provision of sewerage disposal services. In 1986, however, the legislature amended RSA 362:2 to include companies furnishing sewage disposal within the definition of a public utility. *See* Laws 1986, 70:2.

Because the sewer company was unregulated at the outset, the accounting treatment of the costs incurred by CEC to construct and install the sewer system was based primarily on income tax considerations, rather than on public utility ratemaking principles. As a result, CEC aggregated all of its assets related to the Eastman development, including real estate, the golf course, the water system, and the sewer system, into an "inventory cost pool." As each asset was sold, a certain allocated portion of the inventory costs was written off for tax and accounting purposes against the revenue generated by the sale.

In early 1989, the sewer company sought a public utility franchise pursuant to RSA 374:22 and :26 (1984). In connection with the franchise proceeding, the 1982 sewer system lease was amended to ex-

tend its term and, at its conclusion, to give the sewer company an option to purchase the sewer system for nominal consideration, converting the lease from an operating lease to a capital lease. In addition, CEC forgave a substantial amount of past due rent that had never been paid by the sewer company. The PUC awarded the sewer company a franchise in late 1989 and directed it to make a rate filing within one year.

The sewer company made its rate filing on November 1, 1990, proposing to include in the rate base $480,462, thirty percent of the depreciated construction cost of the sewer system. A similar thirty-percent rate base had been approved by the PUC in 1973 for the Eastman Water Company, at that time also a wholly owned CEC subsidiary, organized to provide water service to Eastman.

Because the PUC found that CEC had recovered the major portion of the sewer system investment through the sale of lots and condominiums, it rejected the sewer company's proposed rate base of thirty percent of the depreciated construction cost and instead excluded from the rate base all but $21,143 of the sewer system costs. Relying on the PUC staff's analysis of companies with comparable function, size, and risk, it set a rate of return for the sewer company equal to 11.14 percent. Additionally, the PUC established a capital reserve account of $240,231 to protect ratepayers from the difficulty of raising future capital presented by an undercapitalized utility. The sewer company's motion for rehearing was denied, and this appeal followed.

The standard of review is set forth in RSA 541:13 (1974):

"[A]ll findings of the commission upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable."

*See Appeal of Richards*, 134 N.H. 148, 158, 590 A.2d 586, 592, *cert. denied*, 112 S. Ct. 275 (1991).

The sewer company first argues that the PUC's finding that it has already recovered the cost of the system from the sale of lots and condominiums is not supported by the evidence. We disagree.

     The sewer company proposed a rate base of thirty percent of the depreciated cost of the sewer system, a percentage identical to that proposed for the Eastman Water Company in 1973. From 1973

until the PUC decision, however, the CEC continued to write off a portion of the "inventory cost pool" whenever an asset was sold. Consequently, the PUC reasonably determined that some amount less than thirty percent of the depreciated construction cost remained to be recovered by CEC.

In *Re Mountain High Water and Gas Sales, Inc.*, 76 N.H.P.U.C. 415 (1991), the PUC ruled that because a water company had expensed the cost of the system against the sales of condominium units, it was not permitted to include that cost in the rate base. *Id.* at 418. The sewer company argues that *Mountain High Water* is distinguishable because Mountain High, relying on erroneous advice that it could avoid PUC regulation by mislabeling its utility bills, determined that it had no need to retain any rate base for ratemaking purposes. *Id.* That fact alone, however, does not remove the sewer company from *Mountain High's* ruling. The cost of the system that has been recovered by CEC, albeit under the then most prudent financial scheme, still must be deducted from the rate base. *Windham Estates Ass'n v. State*, 117 N.H. 419, 422, 374 A.2d 645, 647 (1977).

■ The sewer company also argues that the rate base determined by the PUC was an unconstitutional "taking" of its property in violation of both the State and Federal Constitutions. To the contrary, no "taking" of the sewer company's property occurred.

> "No principle of utility rate making is more firmly established than that investors are entitled to a profit on their investment, from which it follows that they are not entitled to a profit on the investment of others, and that contributions of customers to plant are excluded from the rate base."

*Re Princess Anne Utilities Corp.*, 81 PUR3d 201, 202 (Va. 1969).

■ We likewise reject the sewer company's argument that the PUC ignored the value of the capital lease when it determined the rate base. The PUC merely valued the lease *for ratemaking purposes* at an amount equal to the still unrecovered investment in the sewer system. The existence of the capital lease does not, *per se*, alter that value. If it did, "any utility could sell its fully depreciated assets to an associated utility and the associated utility could earn a return on this investment and depreciate the assets again. Quite clearly, utility rates that in effect permit double recovery of capital investment are neither just [nor] reasonable as contemplated by RSA 378:7." *Re Mountain High Water and Gas Sales, Inc.*, 76 N.H.P.U.C. at 418.

■ The sewer company's argument that the rates are confiscatory and unlawful also fails. In determining just and reasonable rates, the PUC must balance the consumers' interest in paying no higher rates than are required with the investors' interest in obtaining a reasonable return on their investment. *See New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95, 302 A.2d 814, 817 (1973). The protection of investors' interests, however, "must be secondary to the primary concern of the commission, which is the protection of the consuming public." *Appeal of Seacoast Anti-Pollution League*, 125 N.H. 708, 720, 490 A.2d 1329, 1338 (1985) (quotations omitted).

■ "[T]he rates must be sufficient to pay only the expenses of operating the system. A margin of profit sufficient to enable the company to attract capital need not be provided for a company of this kind." *Re Princess Anne Utilities Corp.*, 81 PUR3d at 203. In this case, however, the PUC created a capital reserve account to protect both the consumer and the investor from undercapitalization. Because the sewer company has not met its burden of proving that the PUC's orders were unjust or unreasonable, we affirm. *See Appeal of Richards*, 134 N.H. at 158, 590 A.2d at 592.

*Affirmed.*

All concurred.