## In re Green Mountain Power Corp.

[648 A.2d 374]

No. 92-353

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Peck, J. (Ret.), Specially Assigned**

Opinion Filed April 22, 1994

Motion for Reargument Denied July 18, 1994

*Robert V. Simpson, Jr.*, Montpelier, for Appellant Department of Public Service.

*Christopher L. Dutton, Karen Krug O'Neill, Michael H. Lipson,* and *Michael A. Murphy*, Burlington, for Appellee and Cross-Appellant Green Mountain Power Corporation.

*Harriet Ann King* of *King and King*, Waitsfield, for Amicus Curiae Vermont Yankee Nuclear Power Corp.

**Morse, J.** The Department of Public Service (DPS) and Green Mountain Power Corporation (GMP) appeal the Public Service Board's approval of a 5.6% rate increase for GMP. GMP had sought a 9.96% increase, while DPS asserted that only a 2.65% increase was justified. DPS claims that the Board erred by declining to reduce GMP's rate base to account for: (1) interim year accumulated depreciation on GMP's test year plant, and (2) certain projected operating expenses of Vermont Yankee Nuclear Power Corporation that would be passed on to GMP ratepayers. On cross-appeal, GMP contends that the Board: (1) erred by rejecting GMP's proposed 5.5% salary increase for officers and other employees exempt from the company's collective bargaining agreement, and (2) engaged in unlawful retroactive ratemaking by reducing GMP's rate base to credit ratepayers for excess amortization expenses paid under a previous rate. We affirm in part, and reverse in part.

## I. Standard of Review

At the outset, we acknowledge this Court's deferential standard of review in appeals from the Public Service Board. Orders issued by the Board enjoy a strong presumption of validity. *In re East Georgia Cogeneration Ltd. Partnership*, 158 Vt. 525, 531, 614 A.2d 799, 803 (1992). The Board's decisions regarding ratemaking "are subject to great deference in this Court so long as it can be shown they are directed at proper regulatory objectives." *In re Green Mountain Power Corp.*, 142 Vt. 373, 380, 455 A.2d 823, 825 (1983). We accept findings and conclusions adopted by the Board unless the appealing party demonstrates that they are clearly erroneous. See *East Georgia*, 158 Vt. at 531–32, 614 A.2d at 803. In reviewing such findings and conclusions, we defer to the Board's expertise. *Id.* at 531, 614 A.2d at 803. With this standard in mind, we consider each of the parties' claims of error.

## II. DPS Claims

### A. Interim-Year Depreciation

DPS first contends that the Board was required to reduce GMP's rate base to account for interim year accumulated depreciation on the test year plant. We agree.

A basic explanation of ratemaking procedure will be helpful to our discussion of this issue. The Board seeks to establish utility rates for the immediate future that will allow investors a reasonable return without overcharging the ratepayers. As the first step in arriving at a fair rate of return, the Board determines the operating expenses

and the "rate base"—the utility's net plant investment—for the "test year," usually the most recent full calendar year, in this case 1990. The Board then adjusts the rate base by modifying the test year rate base to reflect "known and measurable" changes in plant investment. These are changes that are measurable with a reasonable degree of accuracy and have a high probability of being in effect in the adjusted test year, in this case 1992. Finally, the Board calculates an appropriate return on the adjusted rate base and devises adjusted rates that will produce a fair rate of return on the company's property in the immediate future. See *Letourneau v. Citizens Utilities Co.*, 128 Vt. 129, 134, 259 A.2d 21, 24 (1969) (rates should be set based on latest available relevant test year data to accomplish objective of determining fair rate of return).

DPS argues, as it did before the Board, that the Board was required, as a matter of law, to reduce the test year rate base by the average amount of depreciation ratepayers would pay in 1991, the interim year, on the test year plant. As stated in prefiled testimony by a DPS witness:

> Interim accumulated depreciation is "known and measurable" with absolute certainty. The Company has a certain level of plant in service at the end of 1990. The Company's rates currently include depreciation expense on this plant which will be recovered in 1991 . . . . [T]his is known with certainty and this fact must be reflected in the proforma rate base to prevent over recovery on plant which is already paid for.

By not making this adjustment, DPS argues, GMP is receiving a larger return on investment than that to which it is entitled.

The Board disagreed. Citing its decision in GMP's previous rate case, 119 P.U.R.4th 62 (Vt. Pub. Serv. Bd. 1991), the Board acknowledged that deducting interim year accumulated depreciation had some appeal in a strict accounting sense, but that the deduction would not give GMP a fair rate of return because the utility's plant investment was increasing at a faster rate than it was depreciating. It declined to reduce GMP's 1992 adjusted test year rate base on grounds that the $ 3.076 million reduction, though known and measurable, would be "offset" by potential 1992 adjusted test year plant investment by GMP. The Board pointed out that GMP's net plant investment had increased every year between 1978 and 1989. While acknowledging that it could not be sure, on the basis of the record, that the trend would continue into the adjusted test year, the

Board declined to consider the interim year accumulated depreciation as a "known and measurable" change absent a showing that the trend had reversed itself.

On appeal, GMP concedes that DPS is correct from an accounting perspective, but argues that ratemaking policy should prevail over conventional accounting practices and that "'slavish' adherence to generalized ratemaking principles" will not succeed in balancing the interests of GMP's customers and investors. Specifically, GMP argues that the Board was not legally bound to conclude that interim year depreciation was a "known and measurable" change. Finally, GMP contends that the Board is obligated to use "realistic" methods and adjustments that produce results which are "consistent from one case to the next."

■■ The crux of this dispute is whether the Board acted within its discretion in declining to reduce the test year rate base for what the Board and the parties agree are known and measurable changes, on the basis that to do so would be to deny GMP a fair rate of return. We hold that the Board's decision was erroneous, since the evidence of a known and measurable change in net plant as a result of interim year accumulated depreciation was unquestioned, and the Board's reasons for failing to follow that mandate were vague and not sustained by the record. Though the Board's expertise is at the heart of the deference given its decisions, *In re Telesystems, Corp.*, 143 Vt. 504, 509, 469 A.2d 1169, 1172 (1983), that expertise is not a license to shroud its reasoning in an all-encompassing explanation that a particular decision is simply necessary to yield what the Board perceives is the correct result.

■ Central to the Board's rationale was its assumption that reduction for interim year 1991 accumulated depreciation would be offset by adjusted test year plant investment. Yet in a lengthy and thorough record, there is no evidence from GMP identifying these future investments or suggesting their cost. And the Board itself cast doubt on the existence and scope of such offsets:

> During the evidentiary hearings in this case, the DPS argued that, by not making this adjustment [in prior docket], we allowed the Company a larger rate base, and therefore return on rate base, than the Company actually had in service. The evidence, however, was not unequivocal on this point. GMP points out that depreciation expense and additions to plant accumulate annually; and historically, the two have been largely offsetting. *However,*

*on the basis of this record in this docket, we cannot determine whether the relationship between the two will remain relatively constant or will vary significantly in the adjusted test year. We will need more detailed evidence on the historic relationship of accumulated depreciation and plant additions before we can conclude that the adjustment recommended by the DPS is indeed "known and measurable."* (Emphasis supplied.)

Even more critically, no justification is advanced by the Board for failing to recognize interim year accumulated depreciation as a "known and measurable change," even if GMP had presented evidence of adjusted test year investments.

In sum, the Board failed to identify a nexus between its denial of an undisputed "known and measurable" change in the interim year and offsets—proven or chimerical—in the adjusted test year. As we stated in *In re Green Mountain Power Corp.*, 131 Vt. 284, 303–04, 305 A.2d 571, 583 (1973), findings of fact must be "based exclusively on the evidence and on matters officially noticed by the Board." On review, "we will sustain [the Board's] weighing of the evidence *if there is evidence to support it.*" *Id.* at 305, 305 A.2d at 584. (Emphasis added.) When the Board itself declines to make the requisite findings, we cannot affirm its conclusions. See also *In re New England Tel. & Tel. Co.*, 120 Vt. 181, 192, 136 A.2d 357, 365 (1957) ("Without supporting evidence, the Commission was not at liberty to resort to the 1953 rate proceedings in determining a just and reasonable return in 1956. The justness of the return allowed must be based on present requirements.").

The essential reason to apply the "known and measurable change" principle to the test year rate base is that once customers have, in effect, returned a portion of a utility's investment, they should not be required to pay for that portion a second time, once as depreciation expense and again as a return on plant value which had not been correspondingly reduced to reflect the "return of" the investment through depreciation expense payments. See *State Utilities Comm'n v. Duke Power Co.*, 287 S.E.2d 786, 796 (N.C. 1982) (rejecting power company's suggestion to adjust test period depreciation expenses without an offsetting increase to accumulated depreciation because customers would then pay twice, once for adjustment for depreciation and then again based on an inflated rate base); *Re Idaho Power Co.*, 76 P.U.R.4th 326, 369 (Idaho Pub. Util. Comm'n 1986) (test year rate base should be adjusted by known depreciation

to prevent double counting). See generally C.F. Phillips, The Regulation of Public Utilities at 312 (1984) (discussing double payment issue). The Board's decision has not explained why it should have varied from that principle. GMP argues that the evidence of offsets in the adjusted test year is not the point—that this dispute is not about the existence of facts or the computation of data, but rather the appropriate perspective from which to view the information provided by the parties, and that resolution of the issue will depend on which perspective is deemed correct. While the "appropriate perspective" is a factor that we may assume is an important element of the Board's expertise, it is not a substitute for a rationale. As we stated in *In re Burlington Electric Light Dep't*, 149 Vt. 300, 303, 542 A.2d 294, 296 (1988): "[T]here must be a 'full disclosure of the criteria underlying' the order, *In re Consolidated Rate Appeals of Green Mountain Power Corp.*, 142 Vt. 373, 380, 455 A.2d 823, 825 (1983); otherwise, the Court cannot evaluate whether the agency's conclusions are supported by the findings."

■ In the face of undisputed evidence of interim year accumulated depreciation and a clear mandate to adjust the rate base for known and measurable changes, the Board's failure to deduct the depreciation was not within its discretion as a choice "directed at proper regulatory objectives." *In re Green Mountain Power*, 142 Vt. at 380, 455 A.2d at 825. Based on a careful and thorough review of the record before us, we conclude that the Board's decision may not be sustained as falling within the scope of its discretion, and must be reversed.

Finally on this issue, we note that DPS attempted to show that in the previous rate case, the Board had overestimated GMP's rate base, and that the Board's refusal to include interim year depreciation in that docket resulted in GMP recovering excess rates because the adjusted test year plant was overestimated. DPS argued that the same result would occur in this rate case. The Board disagreed, essentially accepting GMP's analysis. We need not reach this issue in light of our present decision. Even if GMP is right in this instance, as the Board pointed out: "[W]e cannot determine whether the relationship between the two will remain relatively constant or will vary significantly in the adjusted test year." A general trend is no substitute for evidence, especially when, as here, the utility seeking the rate increase has had an ample opportunity to introduce evidence as to its adjusted test year additions to plant, and did not do so.

## B. Vermont Yankee Expenses

■ GMP owns 17.8% of the stock of Vermont Yankee Nuclear Power Corporation. Accordingly, Vermont Yankee provides GMP with approximately the same percentage of its output, and GMP ratepayers pay that percentage of Vermont Yankee's operating costs. DPS argues that the Board should have reduced Vermont Yankee's $155.65 million projected operating expenses by some $2.12 million because the following projected costs were not "known and measurable": (1) $785,000 for a feedwater check valve replacement that was canceled because the Nuclear Regulatory Commission approved retention of the existing valves; and (2) $1.36 million for implementation of future regulatory requirements.

GMP argued before the Board that the "known and measurable" standard should be applied to Vermont Yankee's aggregate operating expense projection, not to individual projects, while DPS argued for a more detailed analysis in which the standard should be applied to each component of the projection. The Board ruled that the projection in its entirety satisfied the "known and measurable" standard, reasoning that Vermont Yankee, as regulated by the Federal Energy Regulatory Commission (FERC), historically had accurately projected its costs, and that the actual costs had been prudent.

Without challenging the Board's conclusion that generally it may apply the "known and measurable" standard against Vermont Yankee's aggregate projection, we conclude that GMP failed to meet its burden regarding the canceled feedwater check valve project. See *In re Green Mountain Power*, 142 Vt. at 381, 455 A.2d at 826 ("burden of supporting change in rates or rate structure [lies] squarely on the proponent utility"). When it is undisputed that an expenditure will not take place, it cannot remain as a projected operating cost. The Board should rely on actual figures as much as possible in approving projected costs.

■ On the other hand, the $1.36 million projected for future regulatory requirements does not represent phantom costs for canceled projects. Rather, Vermont Yankee based this projected expense on regulations being considered that would impact on specific projects, taking into account several variables. Given Vermont Yankee's accuracy in past projections and its detailed analysis regarding this particular expense, the Board did not err by refusing to deduct the expense, which is, by its very nature, difficult to measure. In this instance, the Board was justified in accepting the expense as part of

the overall projection, relying on the "variance of the sum" principle, which holds that the variance of a sum made up of individual volatile items will be less than the variance of the individual items taken separately.

## III. GMP Claims

### A. Salary Increase for Exempt Employees

GMP first claims that the Board erred in lowering GMP's requested wage increase for officers and other employees exempt from the company's collective bargaining agreement from 5.5% to 4%. According to GMP, the Board's findings were insufficient to support a conclusion that the 5.5% increase was "excessive," and even if the Board made sufficient findings, those findings were unsupported by the record.

The Board found that GMP's salary-increase proposal in this case was similar to the one rejected in the previous rate case, 119 P.U.R.4th 62 (1991), which it specifically referred to in its findings. In the prior case, GMP had proposed an increase of 3.5% for hourly employees, 5% for exempt employees, and 6% for officers. *Id.* at 83. Finding that GMP had failed to establish a basis for the disparity between classes of employees, and that GMP executives were among the highest paid in their job categories according to a recent study of fifteen utilities, the Board concluded in that case that the requested increase was excessive considering the depressed economic climate. *Id.* The Board used much of the same reasoning in this case, pointing out further that salary issues would be thoroughly examined in another docket it had opened to investigate GMP's executive compensation policies.

The Board considered conflicting testimony regarding the reasonableness of the wage increase and the disparity between the increases requested for nonexempt and exempt employees. GMP argues that certain market data it presented should have been controlling. However, the mere presentation of such evidence does not entitle the company to approval of its plan. In light of the conflicting evidence presented to the Board, "it was free to determine for itself what was to be believed and accepted, without intervention by this Court, except on some basis related to bad faith, fraud or demonstrable mistake." *In re Green Mountain Power Corp.*, 142 Vt. at 382, 455 A.2d at 826. On the evidence presented, the Board could reasonably conclude that GMP had failed to justify its wage increase proposal, and that a maximum increase, to be allocated at the discretion of GMP, was appropriate.

■ GMP argues that the Board exceeded its authority by "micromanaging" the company and overseeing its salary policies. We agree with the Board's assessment that while the allocation of salary increases should remain within the discretion of the utility, setting levels of overall salary increases that ratepayers must bear is within the discretion of the regulatory agency. GMP's reliance on *Latourneau v. Citizens Utilities Co.*, 125 Vt. 38, 209 A.2d 307 (1965), is unavailing. In *Latourneau,* this Court ruled that the Public Service Commission intruded into the affairs of the utility when it made a finding indicating the appropriate salary of the company president. See *id.* at 46–47, 209 A.2d at 314. Here, the Board did not attempt to dictate individual salaries, but merely set an overall cap on salary increases. We find no error.

## B. Demand-Side Management Expenditures

■ In the previous rate case, the Board had permitted projected demand-side management (DSM) program costs for 1990 and 1991 in the rate base, and amortization of those projected amounts in cost of service for the adjusted test year, 1991. Because GMP's investment in DSM programs during 1990 and 1991 was lower than projected, the amount of amortization expenses paid by ratepayers in 1991 exceeded GMP's actual expenses. Although GMP included only actual DSM expenditures in this docket, the Board reduced the company's rate base by $306,294 to credit ratepayers for the excess amortization payments. We agree with GMP that this constituted improper retroactive ratemaking.[*]

Retroactive ratemaking occurs when rates are set at a level that permits a utility to recover past losses, or that requires it to refund past excess profits, that resulted from a disparity between projected expenses of a prior rate base and actual incurred expenses. *In re Central Vermont Pub. Serv. Corp.*, 144 Vt. 46, 52, 473 A.2d 1155, 1158 (1984). While "the Board may consider a utility's recent past operating experience with such adjustments as will make the test period reflect typical conditions in the immediate future," it may not set a rate "that requires a utility to refund to consumers a portion of its

---

[*] We reject DPS's argument that GMP waived this issue by failing to include it in its motion for reconsideration. Unlike *In re Twenty-Four Vermont Utilities*, 159 Vt. 339, 352, 618 A.2d 1295, 1303 (1992) (intervenors had obligation to raise argument before the Board before raising it with Court), here GMP squarely raised the issue before the Board at the hearing.

previously earned profits." *Id.* at 53, 56, 473 A.2d at 1158, 1160. "[T]he Board has no statutory authority to make whole either the utility company or its customers for inequities that existed in the past." *Id.* at 53, 473 A.2d at 1159.

We agree that the Board's order, in effect, directs GMP to refund the excess rates that it collected based upon the estimated rate base from the prior docket. The principles enunciated in *Central Vermont Public Service Corp.* clearly prohibit the reduction of rates, to which GMP would otherwise be entitled, on the basis that prior projections proved inaccurate. *Id.* ("'Subsequent cases cannot correct past errors.'") (quoting *In re Central Vermont Pub. Serv. Corp.*, 141 Vt. 284, 290, 449 A.2d 904, 907–08 (1982)). Accordingly, we reverse on this issue.

*The parts of the Board's order declining to reduce GMP's rate base to account for interim year accumulated depreciation on the test year plant, accepting Vermont Yankee's projected expenditure for the feedwater check valve replacement, and reducing the rate base to credit ratepayers for excess amortization payments are reversed. In all other respects, the order is affirmed. The matter is remanded for recalculation of the rate increase.*