## In re Petition of Quechee Service Company, Inc. for a Certificate of Public Good and for Approval of Rates, Rules and Regulations

[690 A.2d 354]

No. 95-047

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 13, 1996

*James B. Anderson* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Appellant.

*Michael Marks* of *Tarrant, Marks & Gillies*, Montpelier, for Appellee Quechee Lakes Landowners' Ass'n.

*Geoffrey Commons*, Special Counsel, Montpelier, for Appellee Department of Public Service.

**Johnson, J.** In this case we review two orders of the Public Service Board concerning Quechee Service Company (QSC), a once-private sewer company that became subject to the jurisdiction of the Board following the adoption of 30 V.S.A. § 203(6) in 1993. In the first of the challenged orders the Board established an initial rate base and cost-of-service for QSC; in the second, the Board denied QSC a certificate of public good (CPG). On appeal, QSC contests each aspect of the Board's decision, claiming that the Board erred: (1) by reducing QSC's rate base to reflect the percentage of development costs recovered through lot sales and then further reducing QSC's rate base to account for depreciation; (2) by determining a cost-of-service that was less than QSC's annual out-of-pocket expenses for utility operations, and did not include certain expenses requested by QSC; and (3) by denying QSC a CPG based on acts that occurred before QSC was subject to regulation. In addition, QSC raises a number of constitutional claims, essentially arguing that the Board violated its due process rights by confiscating QSC's rate base and depriving QSC of its "vested property right" to operate a sewer plant in Vermont. We affirm the Board's order in all respects.

This case raises a combination of familiar issues and new questions. The unusual position of QSC, as a private utility with a twenty-year operating history that has now become subject to regulation by the

Board as a public utility, complicates both the findings and decisions of the Board and our review of those decisions. Yet, although this case is complex, and in some ways novel, our standard of review remains the same. Public Service Board orders "enjoy a strong presumption of validity," and we will accept the Board's findings and conclusions "unless the appealing party demonstrates that they are clearly erroneous." *In re Green Mountain Power Corp.*, 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). Our deferential review of the Board's findings recognizes the special expertise of the Board in these matters. See *In re East Ga. Cogeneration Ltd.*, 158 Vt. 525, 531, 614 A.2d 799, 803 (1992).

## I. Background

The Quechee Lakes Subdivision is a resort community that was created in the late 1960s. The subdivision was developed by Quechee Lakes Corporation (QLC), which was required as a condition of its Master Plan to provide for off-site sewage disposal for all lots not suitable for on-site disposal. QLC formed QSC at some point in the late 1960s or early 1970s, to facilitate sewage disposal for the subdivision. QSC, QLC, and the Town of Hartford entered into an agreement in 1973 for the construction of a sewage treatment plant. QSC and QLC agreed to construct the plant, and to pay Hartford to operate it. QSC agreed to serve customers other than those living in the subdivision. In 1977 and 1982, QLC deeded the sewer facilities it constructed (including the plant, leach fields, mains, pumping stations, sewer easements and real estate) to QSC.

In 1979, David LaRoche and associates purchased the stock of QLC and its subsidiaries, including QSC, from CNA Financial for $480,000. From 1986 to 1989, LaRoche held all of QLC's stock, while the LaRoche Grantor Income Trust, of which LaRoche was trustee, held all the stock of QSC. In June 1989, the LaRoche Trust sold the stock of QSC, QLC, and the Quechee Water Company to NECO Enterprises, Inc., a Rhode Island holding company, for $6,500,000. During the first six months of 1989, LaRoche received dividends of $7,331,792 from QLC, QSC and affiliates. The dividends were not matched by earnings. The Quechee Companies showed losses of $1.48 million in 1988, and $551,841 during the first six months of 1989. LaRoche is also the President, Chief Executive, and majority shareholder of NECO (although his NECO stock is being held as collateral for overdue debts). In 1993, LaRoche was convicted of bank fraud in Rhode Island.

During this period, QSC's rates rose sharply. Purchasers of lots in the subdivision are required by deed to pay availability, connection and use fees to QSC if their lots are benefitted by and contiguous to a sewer main. Use fees are paid by those who are connected to the sewer system, while those holding empty lots pay availability fees. QSC's use fees increased more than 1000%, from $105 per year to $1092 per year, over the ten-year period from 1983 to 1993.

In 1993, the Legislature adopted 30 V.S.A. § 203(6), expanding the jurisdiction of the Public Service Board to include sewage companies servicing 750 or more "connections." 1993, No. 21, § 19. The next year the Legislature clarified the Board's jurisdiction and its intent by amending § 203(6) to cover sewage companies servicing 750 or more "household or dwelling units." 1993, No. 120 (Adj. Sess.). This amendment applied to all Board proceedings commencing on or after May 12, 1993, the effective date of the earlier act. *Id.* Because QSC services more than 750 households, it became subject to regulation by the Board as of that date.

Following extensive hearings, a hearing officer appointed by the Board recommended setting QSC's rate base at $1,004,696 and its cost of service at $528,879, and also recommended denying QSC a CPG. In its order issued on November 15, 1994, the Board largely adopted the findings of the hearing officer, but modified some calculations to establish a rate base of $224,665 and a cost of service of $398,154. As is more fully explained below, the Board, on remand from this Court to explain an apparent clerical error in the Board's calculations, further reduced QSC's rate base to $167,775 and its cost of service to $387,455. Finally, in an order dated December 30, 1994, the Board denied QSC a certificate of public good and required the sale of QSC's stock or assets. This appeal followed.

## II. Rate Base Calculation

■ The rate base of a publicly regulated utility is a dollar amount representing the utility's net plant investment. The usual formula for calculating rate base is capital investment plus improvements minus depreciation. *In re Towne Hill Water Co.*, 139 Vt. 72, 75, 422 A.2d 927, 928 (1980). After determining a utility's rate base, the Board determines rates for the utility that represent a fair rate of return on that investment. *Green Mountain Power Corp.*, 162 Vt. at 381, 648 A.2d at 376.

Straightforward application of this formula to QSC is complicated, however, by the gaps and inconsistencies in QSC's financial records.

QSC has not operated as a regulated utility for most of its twenty-year history. Neither the Board nor the parties had the benefit of the type of complete and careful financial records required of regulated utilities. Rather, the Board had the difficult task of calculating a rate base for a company with "fragmentary" financial records, "casual" financial connections with affiliates, and multiple changes of ownership. No audited financial statements were available for QSC, and few were available for its affiliates.

In the face of these obstacles, the Board attempted to apply the formula to achieve a just and reasonable result, based on the information available to it. Choosing a method to calculate rate base is a matter that is within the Board's expertise. *In re Young's Community TV Corp.*, 141 Vt. 53, 56, 442 A.2d 1311, 1313 (1982); see also *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 315-16 (1989) (constitution does not compel single theory of ratemaking; within broad limits, states are free to decide what methodology best meets their needs in balancing interests of utility and public); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) (agency not bound to use of any single formula in determining rates; it is result reached, not method used, that is controlling). We will uphold the Board's determination unless it is shown to be clearly erroneous. *Green Mountain Power Corp.*, 162 Vt. at 380, 648 A.2d at 376.

### A. Methodology

In calculating QSC's rate base, the Board was concerned with crediting QSC's customers for both the depreciation of QSC's assets since construction, and for the contributions in aid of construction made by QSC customers.[1] See *id.* at 383, 648 A.2d at 378 (once customers have returned portion of utility's investment, they should not be required to pay for that portion again). The Board's rate base calculation thus begins with the original cost, and reduces that amount by the percentage of the cost recovered through sales of lots. The unrecovered original cost is then depreciated. Finally, expenditures for additions subsequent to the original investment are added to the depreciated unrecovered original cost to yield QSC's rate base.

QSC's first objection to the Board's rate base calculation is the reduction based on the percentage of cost recovered through sales of

---

[1] For a regulated utility, the cost of a capital improvement is reduced by customer contributions in aid of construction before that cost is entered into the utility's rate base.

lots. Although recognizing that its original cost must be reduced to some extent for customer contributions in aid of construction, QSC argues that those contributions should be calculated based solely on the connection fees paid by purchasers of lots in the subdivision to connect to the sewer system. The Board chose instead to calculate customer contributions using the percentage of QLC's development costs recovered through lot sales. That is, the Board assumed that each time QLC sold a lot, it recovered a proportional share of its overall development costs, including the cost of constructing the sewer plant. While part of that cost may have been labelled "connection fee," the rest would have been built into the price of the lot.

The Board's decision is supported by the evidence. QSC is part of a larger development scheme. The Board found that QLC expected to recover all of its investment cost, including investment in sewage facilities, through lot sales and connection fees. Cf. *In re Eastman Sewer Co.*, 636 A.2d 1030, 1031 (N.H. 1994) (upholding finding of public utility commission that sewer company recovered the cost of its system through condominium and lot sales). By calculating customer contributions using percentage of costs recovered through lot sales, rather than the amounts labelled connection fees, the Board merely recognized that buyers of land are generally concerned only with the total price, not with the relative amounts included within that price.

Although challenging the Board's calculation of customer contributions as "result oriented," QSC's argument is limited to a claim that only those payments from customers labelled "connection fees" should be subtracted from rate base. QSC does not attempt to explain the fatal flaws in its argument: if QLC recovered the cost of the sewer facilities only through connection fees, then QLC (1) recovered none of its cost from hundreds of purchasers of condominiums, who paid no connection fee, and (2) would not have recovered the entire cost of the sewer facilities even if every lot in the subdivision sold, because the connection fees were not sufficient to repay QLC for its investment in the sewer facilities. In light of these unlikely propositions, the Board reasonably concluded that QLC intended to recover its investment in the sewer facilities through lot sales as well as connection fees.

QSC further argues that if the Board reduces its rate base by the percentage of costs recovered through lot sales, then the Board may not also reduce QSC's rate base by straight-line depreciation. According to QSC, this calculation "double counts" QSC's depreciation, because the Board is treating the sewer facility as both a separate depreciable asset and as a component of QLC's cost of nondepreciable

real estate inventory.[2] The Board, QSC claims, may apply only one method of calculating rate base: either by depreciation and connection fees as established by QSC, or by costs recovered through lot sales and connection fees.

In calculating QSC's rate base, the basic question before the Board was how much of the cost of the sewer facilities was paid for by QSC's customers. We do not accept QSC's argument that the Board could consider customer contributions either through lot sales, or through depreciation, but not both. Had QSC been a regulated company, depreciation would have reduced QSC's rate base over the past twenty years. See, e.g., *Green Mountain Power Corp.*, 162 Vt. at 384, 648 A.2d at 378 (Board erred by failing to adjust rate base for interim-year accumulated depreciation). Customers may pay for utility plant costs both through contributions in aid of construction, which reduce the utility's net investment, and through depreciation, which is charged to customers over time. As depreciation is based on investment net of contributions in aid of construction, this calculation does not "double-count" depreciation. Moreover, the Board found that QSC's rates, particularly in the five years preceding regulation, were sufficiently high to repay investors for their depreciation expense.

QSC contends, however, that labelling a portion of its preregulatory profits as depreciation constitutes retroactive ratemaking. QSC claims that the Board, in effect, is attempting to refund customers for excessive past rates by reducing QSC's rate base. QSC is correct that the Board may not set rates for regulated utilities that are intended to redress past inequities. That is, the Board may not set rates that credit customers for past overpayments or repay the utility for past shortfalls. *In re Central Vt. Pub. Serv. Corp.*, 144 Vt. 46, 53, 56, 473 A.2d 1155, 1159, 1160 (1984). In the context of this case, the Board would be engaging in retroactive ratemaking if it set artificially low rates for QSC to make up for purportedly excessive rates paid by customers in past years. But there is no dispute here with the prospective rates set by the Board. Rather, QSC challenges the Board's conclusion that a certain portion of the monies collected by QSC through its preregulatory rates must be deemed depreciation.

---

[2] QSC and its parent companies have, ironically, been treating the sewer facility as both a depreciable asset and an asset held for resale. The financial reports and tax returns of the parent companies have treated the sewer assets as property held for resale, while QSC's own financial reports (unaudited) and tax returns have classified those assets as depreciable property.

The Board made an assumption, one that, in our view, was reasonable under the circumstances of this case, that over the many years since the sewer facilities were built, QSC's customers have been funding depreciation expense on the unrecovered cost of the sewer facilities. This assumption is supported by the fact that QSC's rates were sufficiently high to include a charge for depreciation. Moreover, depreciation is a normal operating expense for a utility, as for any business with substantial capital investment. See *City of Knoxville v. Knoxville Water Co.*, 212 U.S. 1, 13-14 (1909) (before coming to question of profit, utility has both right and duty to set aside earnings sufficient to make good depreciation on its property). Indeed, if the Board had not reduced QSC's rate base to account for depreciation, QSC's customers would have been forced to pay a portion of the plant investment twice, "once as depreciation expense and again as a return on plant value." *Green Mountain Power Corp.*, 162 Vt. at 383, 648 A.2d at 378.

Nor do we accept QSC's claim that the Board improperly based its rate base calculation on the fair value of its sewer facilities. QSC has mischaracterized the Board's decision. The Board did note the effects of time on the sewer facilities, pointing out that QSC's property is in poor condition. In so doing, however, the Board merely underlined the unfairness that would result if QSC's rate base were not adjusted for depreciation.

QSC's dispute with the Board's methodology can be summarized as a complaint that the Board deviated from generally accepted utility accounting principles in calculating QSC's rate base. QSC fails to suggest, however, how those principles can be applied to a utility that for twenty years failed to follow them. Preregulation, QSC was not obligated to follow the principles applicable to public utilities, and is therefore entitled to some latitude with respect to its financial records. Nevertheless, QSC cannot insist that the Board now adhere strictly to those principles in calculating QSC's rate base, where to do so would produce an unfair result. Although QSC has suggested alternative approaches to calculating the company's rate base, QSC has not demonstrated that the method chosen by the Board was clearly erroneous.

## B. Calculation

QSC also contests some of the numbers used by the Board in the rate base calculation. Specifically, QSC argues that the Board over-estimated the percentage of investment costs recovered through lot

sales. The Board concluded that QLC recovered its cost for the sewer facilities only from the sale of lots that could be served by the sewer facilities. As most of these lots were sold, under the Board's calculation most of the cost was recovered. QSC argues that the cost of the sewer facilities was, like other capital costs, intended to be spread across all of the potential lot sales. Because a large number of the lots that QLC obtained legal approval to sell were never sold, or in some cases even subdivided, using QSC's suggested figures yields a much smaller percentage of recovered investment costs.

The hearing officer in his report to the Board used the figures now suggested by QSC. The hearing officer found that QLC had the right to sell a total of 2154 lots and that it had sold approximately 1269 lots. The latter figure uses memberships in the homeowner's association as a proxy for the number of lots sold. Using these numbers, the hearing officer estimated that 58.1% of the investment in the sewer facilities had been recovered. Rejecting this calculation, the Board instead found that only 1532 of the Quechee lots could actually be served by QSC, and that QSC itself reported that 1470 lots had been sold. The Board thus concluded that 95.95% of the investment costs had been recovered.

The numbers used by the Board, however, were based on an exhibit that contained a clerical error. Recognizing this error, we remanded the case to the Board for reconsideration of the rate base calculation. On remand, the parties agreed to two numbers: first, that the subdivision contains 1522 separate properties that are able to receive sewer services, and second, that of those properties, 1493 have been sold or transferred in such a way that the developer had an opportunity to recover its investment costs. Based on these numbers, 98.095% of the investment in the sewer facilities has been recovered.

As the parties now agree on the relevant figures, the only question for this Court is whether the Board erred in concluding that QLC recovered the cost of the sewer facilities only through sales of lots able to receive sewer services. The Board's conclusion is supported by the record. QSC is not capable of serving 2154 lots; only 1522 lots are benefitted by sewer mains. The Board reasonably assumed that QLC intended to recover its investment in the sewer facilities from the purchasers of lots served by those facilities.

The Board's calculation does not conflict with its finding that QLC "considered the sewer system to be a development cost, like road construction and the clubhouse complex, that would be recovered through lot sales." The Board did treat the sewer system as a

development cost recovered through lot sales. Unlike amenities intended for the use of all potential purchasers of lots, however, the sewer system serves only a certain number of lots. If, for example, QLC had built a golf course for use only by owners of single-family homes in the subdivision, QLC would not have intended to recover that cost from purchasers of condominium units. Similarly, the purchaser of a lot not served by the sewer system would not expect to be charged for the construction of that system. As QLC sold 98.095% of the lots served by the sewer system, the Board did not err in calculating that QLC recovered the same percentage of its investment in the system.

## C. Constitutional Claim

QSC also argues that the Board confiscated its rate base in violation of the Fourteenth Amendment to the United States Constitution. As we have previously recognized, public utilities in Vermont have a right to a reasonable, nonconfiscatory rate of return. See *Arlington Selectmen v. Arlington Water Co.*, 136 Vt. 495, 498, 394 A.2d 1130, 1131-32 (1978). That right has a constitutional dimension. See *Duquesne Light Co.*, 488 U.S. at 310 ("At the margins, these questions [as to whether specific rates are unjust or unreasonable] have constitutional overtones."). QSC's investors are entitled to a return on their investment, however, not on the investment of others; that is why customer contributions to plant investment are deducted from rate base. See *Eastman Sewer Co.*, 636 A.2d at 1032. As the Board reasonably concluded that most of the investment in the sewer system was recovered from QSC's customers, the Board did not confiscate QSC's rate base by excluding those customer contributions from its rate base calculation.

## III. Cost of Service

We next consider QSC's challenge to the portion of the Board's order establishing QSC's cost of service. As a general matter, QSC complains that the Board's order is result-oriented, clearly erroneous, and not entitled to any deference from this Court. QSC points to two facts in support of its argument: first, that the temporary rate set by the Board allowed a larger cost of utility operations than does the final order, and second, that the amount approved by the Board to fund the utility's annual expenses is substantially less than the expenditures approved by the Board-appointed independent trustee that ran QSC during 1994.

QSC's claim has no legal basis. Temporary rates are established quickly, without a "full and detailed explanation of the supporting and opposing issues." *In re Green Mountain Power Corp.*, 142 Vt. 373, 390, 455 A.2d 823, 831 (1983); see also 30 V.S.A. § 226(a) (if necessary, following preliminary hearing, Board shall authorize immediate reasonable temporary rate increase pending final determination). As a utility may be required to refund excess temporary rates to customers after the rate case is decided, see 30 V.S.A. § 226(a), the Board may be somewhat generous to a utility when it sets temporary rates without a full understanding of the circumstances. QSC may not use the temporary rates, set prior to the lengthy and exhaustive hearings in this matter, as a basis to criticize the Board's final decision.

Nor may QSC rely on reports filed by the independent trustee as evidence of the company's legitimate annual expenses. These trustee reports are not part of the record in this case. Moreover, based on the parties' allegations, the trustee's accountings cover a portion of 1994, and are therefore not related to the test year used in this case, which ended December 31, 1993. We decline to consider these reports on appeal.

QSC also contests several specific aspects of the cost-of-service order. First, QSC maintains that the Board violated generally accepted utility accounting principles by not including in the cost of service a $30,000 charge for investigating and repairing water infiltration. The Board found that the project should be treated as a capital expense, and not included in the cost of service. Tellingly, QSC points to nothing in the record or the Board's findings to support its description of "betterment accounting" principles or its claim that such principles require including the charge in the cost of service. A single cite to inapposite federal regulations governing electric plants, see 18 C.F.R. Part 101, 10C(3) (1995), does not demonstrate that the Board's finding is clearly erroneous. In the absence of such a showing, the finding must stand.

Next, QSC argues to this Court that the Board should have granted it a bad debt allowance of 12.94% of its cost of service. In the hearings below, however, both QSC and the Quechee Lakes Landowners' Association recommended a bad debt allowance of approximately 2% of cost of service, the same figure chosen by the Board. Again, as the Board's determination is adequately supported by the record, we will not disturb it.

For the same reason, QSC's last challenge to the cost-of-service order must fail as well. QSC maintains that the Board's allowance of

$87,674 for rate case expenses is insufficient and not based on the evidence. In support of its claim QSC again relies on trustee documents that are not part of the record. In addition, QSC ignores the fact that the Board's allowance for rate case expenses is more than twice the amount expended during the test year and somewhat larger than the $80,000 requested by QSC.

## IV. Certificate of Public Good

In its second order, the Board denied QSC a CPG to operate the Quechee sewer system. See 30 V.S.A. § 231(a) (applicant desiring to own or operate business within Board's jurisdiction shall first petition Board to determine whether operation of such business will promote general good; if Board finds favorably, it shall award applicant CPG). The Board considered the past management practices of QSC, including insufficient maintenance, excessive dividends, unexplained cash transfers to NECO, QSC's parent company, and salary guarantees in QSC's name for persons working for NECO. The Board also noted QSC's history of poor customer relations, including one instance where LaRoche materially misrepresented the cost of the sewer facilities in an attempt to justify a rate increase to the customers. Finally, the Board found that QSC was financially unstable and unable to raise capital, based in part on liabilities that QSC incurred on behalf of NECO. In light of QSC's financial instability and the irresponsible past behavior of QSC's management, the Board concluded that issuing a CPG would not promote the general good of the state.[3]

QSC does not contest these findings, but instead makes a number of convoluted statutory and constitutional claims, essentially arguing: (1) that QSC was automatically granted a CPG when 30 V.S.A. § 203(6) went into effect, and the Board could not revoke that CPG based on acts occurring prior to the effective date; and (2) that requiring QSC to petition for a CPG and permitting the Board to consider past acts in ruling on that petition violates several constitutional provisions, including the Due Process and Equal Protection clauses of the Fourteenth Amendment and the prohibition on bills of

---

[3]The Board also referred briefly to proceedings in another case before it. Apparently, the Board had recently issued a preliminary injunction to prevent improper cash transfers from Quechee Water Company, QSC's sister utility, to NECO. QSC claims that the Board violated QSC's due process rights by relying on acts of QWC. The Board, however, merely mentioned this incident in a footnote. The Board's decision denying the CPG was based on other, substantial evidence concerning QSC alone.

attainder. We first consider the statutory claim and then turn to the constitutional arguments.

## A. Statutory Interpretation

QSC maintains that 30 V.S.A. § 126, the saving clause for corporations formed prior to April 2, 1915 that conduct business subject to Board regulation, entitles QSC to a "grandfathered" CPG. The most obvious flaw in this argument is that § 126 on its face does not apply to a company formed in the late 1960s or early 1970s. Moreover, § 126 predates 30 V.S.A. § 231, which establishes the CPG requirement. QSC's suggestion that § 126 should apply by analogy is also unavailing. Even if we were to accept the proposition that corporations governed by § 126 automatically received CPGs when § 231 was enacted years later, QSC has shown only that the Legislature knows how to draft "grandfather" provisions. See 30 V.S.A. § 503(a)(1) (Board shall issue CPG, without requiring proof that business will promote general good, to any company that owned or operated cable television system as of February 10, 1970). The Legislature made no such provision in § 203(6), and we see no reason to infer an intent to do so from an eighty-year-old statute of questionable relevance.

## B. Constitutional Claims

QSC's first constitutional claim is that the Board violated its due process rights by denying a CPG based on acts occurring prior to regulation. According to QSC, the Board unconstitutionally applied § 203(6) retroactively, depriving QSC of its "vested property right" to operate the Quechee sewer facilities.

In making this argument, QSC mischaracterizes the Board's decision. The Board did not deny a CPG merely because QSC's past behavior fell below the standard expected of a regulated utility. The Board considered QSC's current financial condition and ability to provide services in the future. But the Board could not evaluate the company in a vacuum. QSC's current financial instability is the result

of past financial mismanagement,[4] and past management decisions are obviously relevant in attempting to predict future behavior.[5]

We are not persuaded that the Board applied § 203(6) retroactively. Cf. *Carpenter v. Department of Motor Vehicles*, 143 Vt. 329, 333, 465 A.2d 1379, 1382 (1983) (retroactive laws defined as those that take away or impair vested rights acquired under existing laws, or create new obligation, impose new duty, or attach new disability with respect to past transactions). The Board did not punish QSC for its preregulatory acts, nor did it set artificially low rates to compensate customers for past abuses. QSC has not been required to repay its customers for excess profits earned during the years the company operated free of regulation. The Board simply judged QSC's present fitness to operate a regulated utility, and in so doing had no choice but to consider QSC's past conduct as a guide to its likely future behavior.[6] See *In re Telesystems, Corp.*, 143 Vt. 504, 507 n.*, 509, 469 A.2d 1169, 1170 n.*, 1171-72 (1983) (applicant's business experience considered in evaluating cable company's petition for CPG). Any CPG applicant must expect the Board to consider past incidents of mismanagement in making its decision.

■ At any rate, QSC has no "vested property right" to conduct a sewer business that could be affected by the Board's decision. QSC holds no franchise or other grant of authority from the state to operate the Quechee facilities. See *State v. Gibbs*, 82 Vt. 526, 527-28, 74 A. 229, 229 (1909) (franchise is grant by or under authority of government; it has legal character of property or estate in which holder has vested right and is entitled to same constitutional protection as other property). As we have already rejected QSC's "grandfathering" claim, the only basis for this claimed right is the company's twenty-year operating history. Not surprisingly, however, QSC can point to no case that holds that a company's history of operating a particular business or providing a particular service gives

---

[4] QSC's complaint that "QSC is as financially stable as the Board wants it to be" is disingenuous. Of course, if the Board awarded QSC an unjustifiably high rate base, QSC would be in a stronger financial position. But QSC's customers are not required to bail out the company by paying a second time for the cost of the sewer facilities.

[5] QSC suggests that the Board could award a CPG and simultaneously appoint a trustee to run the operation. We agree with the Board that if a trustee and/or other costly safeguards are necessary to protect the public from QSC's management, awarding the company a CPG would not serve the general good.

[6] Considering only actions occurring after QSC became subject to regulation would not have provided guidance to the Board, as for much of that time QSC has been run by an independent trustee.

the company a vested right to continue doing so. Cf. *id.* at 528, 74 A. at 230 (license to sell liquor is not franchise that gives holder vested rights).

QSC's claim that § 203(6) is an unconstitutional bill of attainder, see U.S. Const. art. I, § 9, is similarly without merit. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468 (1977). Although § 203(6) did impose a burden on QSC by subjecting it to regulation, the United States Supreme Court has recognized that "[f]orbidden legislative punishment is not involved merely because [a statute] imposes burdensome consequences." *Id.* at 472. Rather, the proper inquiry is whether the statute "fairly can be characterized as a form of punishment leveled against" QSC. *Id.* at 473.

Based upon the Supreme Court's analysis in *Nixon*, we conclude that the Legislature did not enact § 203(6) as a form of punishment. The statute "further[ed] nonpunitive legislative purposes," *id.* at 475-76, by subjecting a company operating a monopoly utility[7] to regulation by the Board. See *United States v. Patzer*, 15 F.3d 934, 942 (10th Cir. 1993) (statute defining "outfitter" to include "hunting clubs," thereby subjecting hunting clubs to licensing requirement, was not bill of attainder). The Legislature did not confiscate QSC's property[8] nor bar it from the sewer business. See *Nixon*, 433 U.S. at 473-74 (discussing legislative punishments traditionally considered

---

[7]The Board stated that § 203(6) "appears designed to apply to only one sewage company." That the statute defines what is in effect a class of one does not render the statute void as a bill of attainder. See L. Tribe, American Constitutional Law 643 (2d ed. 1988) (law imposing prophylactic measure designed to achieve nonpunitive public purpose on persons with certain general characteristic is not bill of attainder merely because set of persons having that characteristic might be identifiable and known at time law is passed); cf. *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 472-73 (1977) (act concerning presidential papers that refers to President Nixon by name does not automatically offend Bill of Attainder Clause; focus of act can be fairly and rationally understood because only President Nixon's papers demanded immediate attention).

Nor has QSC presented evidence of a legislative intent to punish. See *Nixon*, 433 U.S. at 478 (inquiring whether legislative record evinces intent to punish). The fact that QSC's past abuses were considered by the Legislature is hardly surprising; the regulatory provision was a response to those problems. And comments made by an attorney for the Department of Public Service to a newspaper reporter after the legislation passed are in no way relevant to the question of legislative intent.

[8]The Supreme Court's decision in *Nixon v. Administrator of General Services* does not support QSC's claim that its property was punitively confiscated. The *Nixon* Court specifically rejected such a claim because the statute at issue provided for just

bills of attainder). The question of whether QSC would receive a CPG was properly left to the Board, which applied the same standards to QSC as to any applicant.

Indeed, QSC directs its bill of attainder claim more at the Board's construction of § 203(6) than at the statute itself. Here, however, QSC relies on arguments that we have already rejected, namely that the Board confiscated its rate base and improperly "revoked" its CPG. Assuming that a nonpunitive statute can be transformed into a bill of attainder by the actions of a regulatory body, but see *Walmer v. United States Dep't of Defense*, 52 F.3d 851, 855 (10th Cir. 1995) (constitutional prohibition against bills of attainder applies to legislative acts, not to regulatory actions of administrative agencies), that did not occur in this case. The Board made the regulatory decisions that are entrusted to its expertise, and did so in a fair and reasonable manner. QSC may be unhappy with the result, but it nonetheless has not been punished.

QSC's claim that § 203(6) violates the Equal Protection Clause has even less merit. The statute is an economic regulation that impinges no fundamental right and involves no suspect classification. It is therefore presumed to be constitutional, and must stand if it is reasonably related to a legitimate public purpose. See *Choquette v. Perrault*, 153 Vt. 45, 51-52, 569 A.2d 455, 458-59 (1989). A statute subjecting a private sewage company that serves 750 or more households or dwelling units to regulation by the Board benefits the public by preventing abusive monopoly sewage rates and promoting public health. The so-called "rational basis" test is therefore easily met. Cf. *Town of Sandgate v. Colehamer*, 156 Vt. 77, 88, 589 A.2d 1205, 1211 (1990) (zoning ordinance not unconstitutional, even though it applied to only one person at time of passage; ordinance was neutral on its face and its purposes were reasonably related to public interest).

## V. Conclusion

Finally, QSC repeatedly argues that the Board in this matter was motivated by improper regulatory objectives, namely putting QSC out of business and effectively confiscating its assets, and that this

---

compensation. 433 U.S. at 475. Similarly, QSC has the right to sell its stock or assets at fair market value, based on a just and reasonable rate base set by the Board. As QSC will "'be put in the same position monetarily as [it] would have occupied if [its] property had not been taken,'" *id.* (quoting *United States v. Reynolds*, 397 U.S. 14, 16 (1970)), it cannot argue that the state has punitively confiscated its property.

Court should not defer to the Board's decisions in this matter. See *In re Green Mountain Power Co.*, 142 Vt. at 380, 455 A.2d at 825 (Board's decisions subject to great deference by this Court so long as they are directed at proper regulatory objectives). QSC supports this claim with allegations that the outcome of the hearings in this case was "preordained" and that in effect the Board used its regulatory power to "immediately strip[]" QSC of its rate base and "automatically revoke[]" its CPG.

An examination of the record shows that these allegations are baseless. The Board's actions in this case were neither arbitrary nor abbreviated; rather, its orders are based on lengthy technical hearings, presided over by a hearing officer who even QSC admits was impartial and fair. The Board's decisions include detailed findings and lengthy discussions of the legal and factual bases for the Board's decision. Nothing in the record suggests that the Board was motivated by any goals other than the protection of the general good of the state and the reasonable interests of the customers and investors of QSC. We have concluded that each challenged element of the Board's orders is adequately supported by the record; as QSC's individual claims fail, so must its overall claim that the Board exceeded its authority and engaged in result-oriented decision-making.

*Affirmed.*